Callie Mae NEWSOM, on her own behalf
and on behalf of all others
similarly situated

v.

VANDERBILT UNIVERSITY, Mary Jane
Livingston Gunter, Director of Health
Care Survey Construction, Tennessee
Department of Public Health, Eugene
W. Fowinkle, M.D., Commissioner of the
Tennessee Department of Public Health
and Joseph Califano, Secretary of
Health, Education and Welfare.

No. 75–126–NA–CV.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 1, 1978.

**404**

Gordon Bonnyman, Legal Services of Nashville, Nashville, Tenn., Andreas Schneider, National Health Law Program, Washington, D. C., Joseph J. Levin, Jr., Pamela S. Horowitz, Southern Poverty Law Center, Montgomery, Ala., for plaintiffs.

C. Hayes Cooney, Asst. Atty. Gen., State of Tenn., Nashville, Tenn., for Gunter & Fowinkle.

Hal D. Hardin, U. S. Atty., Nashville, Tenn., Carol C. Conrad, Senior Atty., Public Health Division, HEW, Rockville, Md., for Califano.

## MEMORANDUM

MORTON, Chief Judge.

## I. INTRODUCTION

This action was filed on April 14, 1975, by plaintiff Callie Mae Newsom under Titles VI and XVI of the Public Health Service Act. Title VI, 42 U.S.C. §§ 291–291*o*–1, (officially the Hospital Survey and Construction Act of 1964) is commonly and widely known as the Hill-Burton Act. Title XVI, 42 U.S.C. §§ 300*o*–300t, is a portion of the National Health Planning and Resources Development Act of 1974, 42 U.S.C. §§ 300k, et seq. Because Title XVI in large part reenacts the original Hill-Burton Act (as amended, most significantly in 1964 and 1970), the parties and the court have tended to use the terms "the Act" and "the Hill-Burton Act" in reference to either or both Titles. This practice will be continued in this memorandum except where it is deemed necessary or helpful to do otherwise.

The Hill-Burton Act, one of the earliest forays of the federal government into the health care field,[1] was enacted in 1946 for the purpose of assisting the states (a) in the development of programs for the construction of "facilities for furnishing adequate hospitals, clinic, and similar services to all their people; and (b) to construct public and other nonprofit hospitals in accordance with such programs."[2] Federal money in the form of both grants and loans has been made available under the Act pursuant to plans drawn and administered by state health agencies with federal approval and supervision.

It is stipulated that (a) Vanderbilt University Hospital received seven federal grants totalling $3,181,009.63 pursuant to the Hill-Burton Act for construction projects initiated between 1957 and 1971; (b) the receipt of these grants vested the hospital with an obligation to provide "a reasonable volume of uncompensated services to persons unable to pay therefor" pursuant to the provisions of section 291c(e)(2) of the Act and regulations promulgated thereunder;[3] and (c) in each of the seven

---

1. Rose, *Federal Regulation of Services to the Poor Under the Hill-Burton Act: Realities and Pitfalls,* 70 Nw.L.Rev. 168, 169 (1975) [hereinafter cited as Rose].

2. Title VI of the Public Health Service Act of Aug. 13, 1946, Pub.L.No.79–725, § 601, 60 Stat. 1041. The statement of purpose was somewhat enlarged by the 1964 amendments to the Act. *See* 42 U.S.C. § 291.

3. Section 291c provides in pertinent part as follows:

   The Surgeon General, with the approval of the Federal Hospital Council and the Secretary of Health, Education, and Welfare, shall by general regulations prescribe—

   *State plan requirements; assurances necessary for approval of application*
   (e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to

applications Vanderbilt gave written assurances that it would provide such services. The manner and extent of Vanderbilt's fulfillment of this obligation and the extent to which the federal and state agencies have monitored and enforced Vanderbilt's compliance are the central issues of this case.

Plaintiff Newsom is an indigent person who contends that defendant Vanderbilt University's hospital has failed to provide a reasonable volume of services to persons unable to pay therefor in violation of its contractual, statutory and regulatory duties under the Act. She contends in the alternative that even if such services have been provided, the hospital's procedures for the distribution of such care violate procedural due process under the fifth and fourteenth amendments. She further contends that the state and federal defendants responsible for enforcement of the Act have failed to fulfill that responsibility, and she attacks certain of the federal defendant's regulations as being inconsistent with the Act and the Constitution. Plaintiff also invokes 42 U.S.C. § 1983, asserting that defendants have acted under color of state law to deprive her of rights, privileges or immunities secured to her by the Act and the Constitution. Declaratory, injunctive and mandamus relief are sought on her own behalf and on behalf of a plaintiff class.

Defendants initially argued that plaintiff had failed to exhaust administrative remedies, but this issue is no longer viable. A complaint was filed with the Secretary of Health, Education and Welfare (HEW) on February 4, 1977, alleging Vanderbilt University Hospital's failure to comply with its obligation to provide free care pursuant to section 291c(e)(2) of the Act. On August 4, 1977, the complaint was dismissed by the Secretary with a finding that the hospital was in "substantial compliance." This action thereby became ripe for judicial determination pursuant to 42 U.S.C. § 300p–2(c), which provides:

The Secretary shall investigate and ascertain, on a periodic basis, with respect to each entity which is receiving financial assistance under this subchapter or which has received financial assistance under subchapter IV of this chapter or this subchapter, the extent of compliance by such entity with the assurances required to be made at the time such assistance was received. If the Secretary finds that such an entity has failed to comply with any such assurance, the Secretary shall take the action authorized by subsection (b) of this section or take any other action authorized by law (including an action for specific performance brought by the Attorney General upon request of the Secretary) which will effect compliance by the entity with such assurances. *An appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint* or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary.

(Emphasis added.)

In addition to the above section, jurisdictional bases for this action include 28 U.S.C. § 1331, conferring federal question jurisdiction over plaintiff's claims under 42 U.S.C. § 1983, and 28 U.S.C. § 1361, the mandamus statute.

The court entered a temporary restraining order on the day the action was filed, restraining defendant university and its collection agent from prosecuting a collection action against plaintiff in the state courts. The collection agency subsequently was dis-

---

the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in

the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

missed as a party defendant upon the stipulation of the parties that in all matters relevant to this action the firm had acted solely as agent of the defendant university. The case was certified pursuant to Rule 23(c) of the Federal Rules of Civil Procedure as a class action to be maintained by plaintiff on behalf of all others similarly situated. The case was tried to the court without a jury on September 8, 1977.

## II. EFFECT OF ADMINISTRATIVE FINDING AS TO COMPLIANCE

The issue of Vanderbilt Hospital's compliance with its free service obligation raises a number of subsidiary issues concerning the definition of compliance, but first the court must address a preliminary question of administrative law. Because the Secretary of HEW determined, pursuant to his "investigation" of the administrative complaint filed on plaintiff's behalf, that the hospital was in substantial compliance with its free care obligation, the court must ascertain the effect, if any, of the administrative finding on the present action. This is essentially a matter of interpreting section 300p–2(c), quoted *supra,* and is apparently a question of first impression (except by analogy to similar provisions in other statutory contexts).

■ The National Health Planning and Resources Development Act of 1974, of which section 300p–2(c) is a part, was enacted "to amend the Public Health Service Act to assure the development of a national health policy and of effective State health regulatory programs and area health planning programs, and other purposes . . ." S.Rep.No.93–1285, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News, p. 7842 [hereinafter Senate Report]. The Act "replace[s] the State areawide planning components of five programs, conducted under the Public Health Service Act," just one of which is the Hill-Burton program. 120 Cong.Rec. 37240 (1974) (remarks of Sen. Javits). Thus it is not sur-

prising that the legislative history, while extensive, is not narrowly focused and contains no specific discussion of section 300p–2(c).[4] The court has, therefore, relied on other indicators of congressional intent in reaching the conclusion that the "appropriate action to effectuate compliance" prescribed in section 300p–2(c) is a trial de novo rather than merely a judicial review of the Secretary's determination. Thus the court is certainly not bound by the Secretary's finding, nor is the court limited by the "clearly erroneous" and "substantial evidence" standards in its scrutiny of his decision. This does not mean, however, that the administrative action is totally without significance. It is, of course, important regardless of its merits as a procedural prerequisite to the present action, and it is to be considered on its merits as part of the evidentiary record before the court. (A certified copy of the Secretary's decision was submitted by defendants as Trial Exhibit 14.)

The above conclusion was reached by comparing the language of section 300p–2(c) with similar provisions of Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e–5(b) and (f)(1); by consulting the judicial interpretations of these older provisions; by contrasting section 300p–2(c) with another section of the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300s; and, of course, by examining section 300p–2(c) on its face.

Section 2000e–5(b) of the 1964 Civil Rights Act provides in pertinent part that:

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, . . . alleging that an employer . . . has engaged in an unlawful employment practice, the [Equal Employment Opportunity] Commission shall serve a notice of the charge . . . on such employer . . . and shall make an investigation thereof. . . . If the Commission determines after such inves-

---

4. Research conducted on behalf of this court by a staff member of the Law Library of Congress revealed nothing in the legislative history of the

Act regarding the type of judicial action allowable under section 300p–2(c).

tigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge . . . .

A dismissal pursuant to this provision, like a dismissal under § 300p–2(c), does not preclude further action by the claimant, as is made clear in subsection (f)(1) of section 2000e–5, which provides in part:

If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, . . . a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved . . . . .

■ While the language of section 300p–2(c) of the Hill-Burton Act quoted in the introduction, *supra,* is not identical to that of section 2000e–5 of the Civil Rights Act, the pattern of administrative complaint, investigation, and dismissal as preludes to judicial action is the same, and the‌ language is sufficiently similar to make judicial interpretations of section 2000e–5 helpful in the interpretation of section 300p–2(c). It is well settled that section 2000e–5 contemplates a trial de novo, *see, e. g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 38, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); and that the judicial proceeding is not an appeal from the EEOC action, *see, e. g., Grimm v. Westinghouse Electric Corp.,* 300 F.Supp. 984, 989 (N.D.Cal.1969). Thus, while the findings of the EEOC may be evidence, they are not controlling in the judicial action. *See, e. g., Jurinko v. Edwin L. Wiegand Co.,* 331 F.Supp. 1184, 1186 n.4 (W.D.Pa.1971); *Fekete v. United States Steel Corp.,* 424 F.2d 331 (3d Cir. 1970); *Grimm v. Westinghouse Electric Corp., supra.* Except as any other evidence before the court, the administrative proceedings and determination are, as stated in *Hyatt v. United Aircraft Corp.,* 50 F.R.D. 242, 246 n. 4 (D.Conn.1970), "irrelevant for any purpose other than establishing the jurisdictional basis for [judicial] action."

In 1976 the Supreme Court in *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), extended the "well-established" right of private-sector employees "to a de novo consideration of their Title VII claims" to federal employees. The Court found that the plain language of the statute involved, as well as its legislative history, overcame the presumption against de novo review invoked by the Court in such decisions as *Consolo v. FMC,* 383 U.S. 607, 619 n.17, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). The unanimous *Chandler* Court noted that:

In most instances, of course, where Congress intends review to be confined to the administrative record, it so indicates, either expressly or by use of a term like "substantial evidence," which has "become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court." [Citations omitted.]

425 U.S. at 863 n.37, 96 S.Ct. at 1960.

The above language is particularly pertinent to the comparison of section 300p–2(c) with its companion provision in the National Health Planning and Resources Development Act of 1974, section 300s. The term "substantial evidence" is not to be found in 42 U.S.C. § 300p–2(c), nor is the phrase "arbitrary and capricious," nor are any other terms that connote limited review. It cannot be argued, however, that Congress merely altered its semantics when drafting the National Health Planning and Resources Development Act of 1974, for the terminology of administrative review abounds in section 300s, which in earlier versions of the legislation immediately followed what is now section 300p–2(c). *See* 120 Cong.Rec. 39649 (1974) (sections 621 and 622 of Senate Bill). Section 300s provides that

If—

(1) the Secretary refuses to approve an application for a project submitted under section 300o–3 of this title, the State Agency through which such application was submitted, or

(2) any State is dissatisfied with, or any entity will be adversely affected by, the Secretary's action under section 300p–2 of this title, such State or entity,

may appeal to the United States court of appeals for the circuit in which such State Agency, State, or entity is located, by filing a petition with such court within sixty days after such action. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary, or any officer designated by him for that purpose. The Secretary thereupon shall file in the court the record of the proceedings on which he based his action, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall have jurisdiction to affirm the action of the Secretary or to set it aside, in whole or in part, temporarily or permanently, but until the filing of the record, the Secretary may modify or set aside his order. The findings of the Secretary as to facts, if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may remand the case to the Secretary to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall file in the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence. The judgment of the court affirming or setting aside, in whole or in part, any action of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28. The commencement of proceedings under this section shall not, unless so specifically ordered by the Court, operate as a stay of the Secretary's action.

The bulk of this section is a verbatim reenactment of section 291h of the Hill-Burton Act (as added in 1964), which had been interpreted, prior to the enactment of section 300p–2(c), not to foreclose civil actions in the district courts by individuals claiming to be aggrieved by the Secretary's actions. *See, e. g., Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034 (5th Cir. 1974), and cases cited therein. (The *Saine* court cites and rejects conflicting authority

on this point, but any doubt has, of course, been removed by the enactment of section 300p–2(c).)

Section 300p–2(c) contains no reference to section 300s. The language of 300s clearly demonstrates that the terminology of judicial review of administrative action was staring Congress in the face when it chose instead to couch section 300p–2(c) in language far closer to the language of section 2000e–5, which had already been construed to provide for de novo consideration. (Congress is "presumed to know the interpretation which courts make of its enactments . . . ." *Hamby v. McDaniel,* 559 S.W.2d 774, 776 (Tenn.1977) (citing *Missouri v. Ross,* 299 U.S. 72, 57 S.Ct. 60, 81 L.Ed. 46 (1936).) It is, of course, logical for Congress to vest the district courts with de novo jurisdiction while confining the courts of appeals to limited review, for the taking of new evidence is the normal function of trial courts and is one for which they, but not the appellate courts, are well equipped.

The final and most persuasive indication of congressional intent is on the face of section 300p–2(c) itself. Immediately prior to the provision that "[a]n appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary . . . ." is language entitling the Secretary to "take any other action authorized by law (including an action for specific performance brought by the Attorney General upon request of the Secretary) which will effect compliance by the entity with such assurance." Such an action brought on the Secretary's behalf would certainly not be a judicial review of his own determination, and the clear implication of the statute is that if he does not see fit to bring such an action, aggrieved individuals may do so. (It is plain that specific performance is but one example of the remedies that are potentially "appropriate.")

Although this discussion began by noting that the legislative history of the National Health Planning and Resources Development Act of 1974 contains no specific mention of section 300p–2(c), the general thrust

of the history in no way contradicts the above interpretation and in fact does lend some support. At the request of the Health Subcommittee of the Senate Committee on Labor and Public Welfare, the General Accounting Office conducted an appraisal of the implementation of the Hill-Burton Act, particularly but not exclusively the 1970 amendments. Senate Report, *supra,* at 7899. The Committee was disturbed by the resulting information, noting that HEW had failed to implement the intent of Congress in a number of important respects. *Id.* The Committee reported to the Senate that:

> [T]he GAO Report states that "the implementation of the free service requirement is in its infancy at the State agency and local facility level." It states that "while the State plans reviewed contained provisions which essentially met the Federal requirements, none of the State agencies had an active program for monitoring compliance with the requirement. Most intend to rely on complaints to monitor compliance. Also, some facilities have not informed the State agencies how they intend to meet the reasonable volume of free services requirement." This seems to the Committee to be a sorry performance by the Department and the State Hill-Burton agencies in implementing a provision which has been in law for over 20 years, and which has recently been reemphasized.

*Id.* at 7900. Such a report of HEW's performance is unlikely to have inspired a congressional desire to protect the agency's determinations by providing only for limited review. Buttressed by all of the above, it is the decision of this court to base its assessment of Vanderbilt's compliance with its free care obligation on the entire record before the court rather than on the evidence cited by the Secretary as the bases for his conclusion.

## III. DEFINING COMPLIANCE

HEW's shortcomings in enforcing compliance with the free care provision of the Hill-Burton Act, attributed by one authority to "the tendency of regulatory agencies to become the 'captive' of the viewpoint of the very interests they were intended to regulate,"[5] has created problems in determining just what constitutes compliance. The free service obligation was virtually ignored until 1972, 25 years after Hill-Burton was enacted and 15 years after Vanderbilt received its first grant. Regulations implementing the free care obligation in 1947 were "originally phrased in precatory language, without any provision for enforcement . . .."[6] The first enforcement regulations were finally promulgated in 1972, but then only after a series of lawsuits forced the agency into action.[7] These regulations have since been changed in several important respects and, in fact, have not yet achieved stability.

The evidence before the court in this case (some of which contradicts the factual bases assigned by the Secretary for his finding of Vanderbilt's compliance) establishes that if the current interpretation of the meaning of "compliance" were applied retroactively, Vanderbilt would be found seriously wanting. The court agrees that at least until very recently Vanderbilt at best regarded its Hill-Burton obligation as a final write-off for bad debts and at worst ignored it completely. This court cannot, and will not, however, hold Vanderbilt to requirements that had not yet been imposed or of which it had no notice.

---

5.  Rose, *supra* note 1, at 168.

6.  *Id.* at 172.

7.  *See Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972); *Corum v. Beth Israel Medical Center,* 373 F.Supp. 558 (S.D.N.Y.1974) (defendant's motion to dismiss denied), 373 F.Supp. 550 (S.D.N.Y.1974) (plaintiff's motion for summary judgment granted in part), 359 F.Supp.

909 (S.D.N.Y.1973) (defendant's motion to dismiss denied); *Cook v. Ochsner Foundation Hospital,* 61 F.R.D. 354 (E.D.La.1973) (plaintiff's motion for summary judgment granted in part); *Perry v. Greater Southeast Community Hospital Foundation,* Civ. No. 725–71 (D.D.C. June 28, 1972); *OMICA v. James Archer Smith Hospital,* 325 F.Supp. 268 (S.D.Fla.1971).

### A. Duration of the Free-Care Obligation

Two issues arise concerning the span of Vanderbilt's obligation. Section 53.111 of 42 C.F.R., entitled "Services for persons unable to pay," begins with a provision limiting its applicability. 42 C.F.R. § 53.111(a), which became effective October 1, 1976, provides in pertinent part that:

> The provisions of this section apply to every applicant which heretofore has given or hereafter will give an assurance that it will make available a reasonable volume of services to persons unable to pay therefor but shall not apply to an applicant (1) for more than 20 years after the completion of construction of any facility with respect to which funds have been paid under . . . the Act . ..

The issues presented by this section are, first, the validity of the regulation itself as applied to facilities such as Vanderbilt whose grants significantly predated meaningful enforcement of the free-care obligation, and second, (assuming the validity of the regulation) the interpretation of the phrase "completion of construction," which determines the beginning, and more importantly for the present case, the end of a facility's free service obligation.

### 1. Validity of the 20-Year Limitation as Applied to Older Facilities

Plaintiff argues that the intent of section 53.111(a)(1) is to require grant recipients to provide uncompensated services for a period of 20 years, that Vanderbilt has provided such services if at all only in the very recent years since enforcement of the obligation has begun, and that therefore it should not receive credit for the preceding years between completion of its Hill-Burton projects and the beginning of its actual compliance. This interpretation contravenes the language of the regulation limiting its own applicability to 20 years, rather than demanding 20 years of service. The Secretary could easily have expressly provided for the result urged by plaintiff, and since he did not, plaintiff's argument constitutes a challenge to the validity of the regulation. In *Corum v. Beth Israel Medical Center,* 373 F.Supp. 550, 556–57 (S.D.N.Y.1974), the 20-year provision was upheld in the face of plaintiffs' argument that the absence of such a limitation in the Hill-Burton Act itself indicated that the regulation was "repugnant to the wishes of Congress." *Id.* at 556. The court found, however, that the lack of statutory limitation was "as consistent with a desire on the part of Congress to leave the task of determining reasonableness to the Secretary and the [Federal Hospital] Council as with a wish to impose an entirely open-ended obligation on Hill-Burton grantees." *Id.* at 556–57. The court further found the limitation to be reasonable "in the particular circumstances of this case." *Id.* at 557. It has been appealingly argued that inasmuch as the facility in *Corum* was new and therefore the 20 years of its obligation remained, the *Corum* decision should not be applied to older facilities.[8] The contention that the *Corum* holding was limited to the facts of that case was rejected in *Lugo v. Simon,* 426 F.Supp. 28, 35 (N.D.Ohio, 1976), in which the court also upheld the 20-year provision. *See also Cook v. Ochsner Foundation Hospital,* 559 F.2d 968, 973 (5th Cir. 1977). Nonetheless this court will present its own discussion of the suggestion that the 20-year limitation should not be applied as written to older facilities. There are two problems with this position, both stemming from the failure of HEW to properly regulate and enforce the free-care provision until 1973. Facilities were not required to keep records of Hill-Burton care provided, and therefore, "it is impossible to document the extent to which a hospital [had] provided charity care [prior to that time]."[9] This

---

8. Schwartz & Rose, *Opening the Doors of the Non-Profit Hospital to the Poor,* 7 Clearinghouse Rev. 655, 657 (1974).

9. Federal Hospital Council, Tr. of Proceedings on Oct. 20, 1972, at 127, *quoted in* Comment, *Provision of Free Medical Services by Hill-Burton Hospitals,* 8 Harv.C.R.–C.L.L.Rev. 351, 356 (1973).

is certainly the case with defendant Vanderbilt whose separate accounting for Hill-Burton free care commenced in April 1974, retroactive to July 1973.

The depositions of James P. Brineaux, the new Patient Account Director and the former Director of Insurance and Credit Collections, makes it abundantly clear that determining the exact volume of free-care provided before that time would be impossible. He stated that when he became Director of Insurance and Credit Collections in June of 1974 the guidelines for handling Hill-Burton care "were not strictly set" and that he was "not really sure anyone knew exactly how to handle Hill-Burton" at that time. Tr. Exh. 1, at 13. *See also* note 11, *infra.*

■ To hold that the 20-year obligation should begin on the effective date of the regulation for facilities with grants predating the regulation would have the effect of unjustly penalizing those hospitals that had complied in the past as well as those that had not. It might be argued that where it has been *proved* that a facility had not complied, the 20-year provision should not be allowed to absolve such noncompliance. Unfortunately, this calls forth the second problem and the fatal flaw in plaintiff's attempt to deny Vanderbilt the benefit of the 20-year limitation as provided in 42 C.F.R. 53.111(a): It is impossible to prove noncompliance where compliance is essentially undefined. The so-called "presumptive compliance guidelines" were not promulgated until 1972,[10] and the regulations defining which services can properly be counted toward fulfillment of the free-care obligation have been anything but settled. Prior to August 6, 1972, the effective date

of the interim regulations, compliance was defined as follows:

The facility will furnish below cost or without charge a reasonable volume of services to persons unable to pay therefor. As used in this paragraph, "persons unable to pay therefor" includes persons who are otherwise self-supporting but are unable to pay the full cost of needed services. *Such services may be paid for wholly or partly out of public funds or contributions of individuals and private and charitable organizations such as community chest or may be contributed at the expense of the facility itself.* In determining what constitutes a reasonable volume of services to persons unable to pay therefor, there shall be considered conditions in the area to be served by the applicant, including the amount of such services that may be available otherwise than through the applicant. The requirements of assurance from the applicant may be waived if the applicant demonstrates to the satisfaction of the State agency, subject to subsequent approval by the Secretary that to furnish such services is not feasible financially[.]

42 C.F.R. § 53.111(b) (1972) (emphasis added). As this court has already stated, it cannot hold Vanderbilt responsible for compliance under the current, more stringent regulations before they were promulgated, and plaintiff cannot prove noncompliance by demonstrating, as she unquestionably has, that defendant hospital's past performance did not constitute compliance by present standards. Under the above quoted regulation it is hard to imagine how Vanderbilt could have failed to comply.[11] It is

---

10. 42 C.F.R. § 53.111(d) provides:

(d) *Presumptive compliance guideline.* An applicant which, for a fiscal year, (1) budgets for the support of, and makes available on request, uncompensated services at a level not less than the lesser of 3 percent of operating costs or 10 percent of all Federal assistance provided to or on behalf of the applicant under the Act, or (2) certifies that it will not exclude any person from admission on the ground that such person is unable to pay for needed services and that it will make availa-

ble to each person so admitted services provided by the facility without charge or at a charge below cost which does not exceed any such person's ability to pay therefor as determined in accordance with criteria established pursuant to paragraph (g), shall be deemed in presumptive compliance with its assurance. [Portion of regulation applicable only to loan guarantees omitted.]

11. If intentional compliance had been required, however, Vanderbilt might well have provided no Hill-Burton free care at all until recently.

clear from the record that many patients have received "free" care at the hospital paid for by Medicare, Medicaid, or other public funds, or by private charitable organizations. This court therefore holds that plaintiff has not met its admittedly impossible burden of proof either to support her claim of noncompliance prior to 1973 or to make it feasible for the court to hold the 20-year limitation invalid as applied to Vanderbilt Hospital.

## 2. Beginning Date of 20-Year Period

The second issue concerning the 20-year limitation arose somewhat unexpectedly when the court asked each defendant to submit an affidavit stating when the hospital's various projects had been completed within the meaning of 42 C.F.R. § 53.111(a)(1), thus beginning the 20-year spans. (These dates were nowhere to be found in the voluminous and detailed record.) The first affidavit to be filed, that of the state defendants, provided the following information, including most notably, two different sets of dates of completion:

The dates on which construction was completed within the meaning of 42 CFR 53.111(a)(1), on Vanderbilt University Hospital "Hill Burton Projects", according to the records of the [Tennessee] Office of Health Planning and Resources Development are listed below:

| Pro. # | Date of Final Inspection * | Date of Final Funds Approval * | Hill Burton Share |
|---|---|---|---|
| 47 | 7–12–62 | 2–13–64 | 1,581,067.28 |
| 704 | 6– 4–59 | 12– 4–61 | 232,847.15 |
| 704A | 12–20–63 | 8–22–66 | 344,879.64 |
| 704B | 12– 4–67 | 2– 5–70 | 349,494.06 |
| 704C | 10–22–69 | 1–19–71 | 426,111.47 |
| 704D | 5– 5–73 | 11–29–73 | 127,361.57 |
| 805 | 4–16–73 | 6–17–74 | 119,608.46 |
| | | Total | 3,181,009.63 |

Mr. Hewitt Rogers, who served as Director for Patient Admissions and Patient accounting for Vanderbilt Hospital for approximately *20 years* prior to assuming his present position as the hospital's Director of Admissions in the Spring of 1976, testified in his deposition that the first time he had ever heard of the Hill-Burton Act and of the hospital's obligation to provide free

[Columns showing "Applicants Share," "State Aid" and "Total Cost" are omitted.]

* Two dates are listed because the final inspection date represents project completion and the final funds approval date is used by DHEW for initiation of the 20 year obligation as well as for Recovery Procedures.

Roughly calculated, using the earlier dates would lessen Vanderbilt's remaining Hill-Burton obligation under these grants by an aggregate of over $550,000. Not surprisingly, the affidavit submitted by Vanderbilt listed only the earlier dates, the dates of final inspections. The federal defendants provided only the later ones, the dates of final funds approvals. The parties were asked to brief the issue, and it is the decision of the court that the federal defendants have amply supported their own interpretation of the regulation, at least as applied to past projects. The brief filed on behalf of the Secretary of HEW states that although the opening date of a project facility is the most logical date from which to compute the free-care obligation, "opening dates have not in the past been made available to the Federal defendant." Memorandum of Federal Defendant, filed May 1, 1978, at 3. Faced with two less desirable alternatives, the date of final inspection and the date of final funds approval, the latter is deemed more reasonable because:

In most cases, the final inspection will occur *before* the project is open, i. e., providing services. This will not generally be the case, however, with respect to the date of [final funds approval]. . .

It is of course possible that in certain cases the date of final inspection might likewise be supportable in terms of the commencement of the 20 year obligation; perhaps the Vanderbilt projects are such a case. Nevertheless, the Federal defendant in administering a national program must make interpretations that

services was in the latter part of 1972. (Tr. Exh. 11, at 8.) Mr. Anthony Bull, Assistant Director of Patient Accounts and formerly Assistant Director of Patient Accounting, stated that to the best of his recollection he first learned of the Hill-Burton program in early 1973. (Tr. Exh. 2, at 6.)

make sense in the *usual* case, although it may not be optimal for certain individual cases.

*Id.* (emphasis in original).

■ The court therefore holds that for purposes of Vanderbilt University Hospital's pre-existing Hill-Burton grants, the twenty year period prescribed in 42 C.F.R. § 53.111(a)(1) shall be computed beginning with the dates of final funds approval of each project. Under the "presumptive compliance" alternative chosen by Vanderbilt, the hospital is thus obligated to provide annually free services in an amount equal to or greater than 10% of the grants for which the final funds approval was given within the preceding twenty years. (The court would note, however, that it would be a relatively simple matter for the Secretary to require that HEW be provided with the opening dates of project facilities so that he need not be "forced to fall back on an alternative," Memorandum of Federal Defendant, at 3, the date of final funds approval for future projects.)

### B. Vanderbilt's Compliance Under Changing Regulations After 1972

The regulations promulgated by HEW in 1972 became applicable to Vanderbilt at the beginning of the hospital's next fiscal year, July 1, 1973. These regulations, 42 C.F.R. § 53.111 (1973), set out the presumptive compliance guidelines pursuant to which Vanderbilt opted to fulfill its free care obligation by providing uncompensated services annually in an amount not less than 10% of Federal assistance received by it under the Act. *See* 42 C.F.R. § 53.111(d), *quoted in* note 9, *supra.* Subsection (f) limited the services that could be counted toward fulfillment of a facility's obligation as follows:

(f) *Qualifying Services.* (1) In determining the amount of uncompensated services provided by an applicant, there shall be included only those services provided to an individual with respect to whom the applicant has made a *written determination prior to any collection effort other*

*than the rendition of bills* that such individual is unable to pay therefor under the criteria established pursuant to paragraph (g) of this section except that such collection efforts may be made against a third party insurer or against a governmental program.

(2) *There shall be excluded from the computation of uncompensated services*:

(i) Any amount which the applicant has received, or is entitled to receive, from a third party insurer or under a governmental program; and

(ii) The reasonable cost of any services for which payment in whole or in [part would be available under a govern-] [mental program (e. g., Medicare and] Medicaid) in which the applicant, although eligible to do so, does not participate, but only to the extent of such otherwise available payment.

42 C.F.R. § 53.111(f) (1973) (bracketed lines reversed in C.F.R. but as shown above in 37 Fed.Reg. No. 142, July 22, 1972) (emphasis added). The portion of this regulation permitting facilities to delay determination of Hill-Burton eligibility until after billing was struck down in *Corum v. Beth Israel Medical Center, supra,* as enabling hospitals to fulfill their free service obligation by writing off bad debts, "an expense of operating which they must bear themselves." 373 F.Supp. at 557. The court stated that

If a hospital is not obliged to make a determination of indigency prior to the rendition of services, many truly indigent persons may incur liabilities to it in the hope of qualifying for free or below cost services, which they will later be hard pressed to pay if the hospital declines to treat them as beneficiaries of its Hill-Burton assurance on the ground that by the time of billing its requirement has been satisfied [for the current fiscal year]. Furthermore, . . . many such persons will be discouraged by the uncertainty of their status from seeking any medical assistance at all.

. . . Moreover, since there is such a great likelihood that the provision will act to bar "persons unable to pay" for hospital services from seeking to benefit from the uncompensated services which the statute mandates for their benefit, it is antithetical to the goals of the Act. . . . It is fully understandable that hospitals wish to count towards their Hill-Burton requirement all services for which collection proves difficult. The statute, however, does not contemplate this convenient result. Rather, the only services for which the statutory assurance is received are those provided to persons who are "unable", not merely unwilling to pay.

*Id.* at 557.

■ The *Corum* decision was rendered on April 30, 1974. On September 5, 1974, HEW notified all state Hill-Burton agencies that the old "billing provision" had been invalidated. The memorandum of notification further stated the following:

We are currently involved in the development of a new regulatory provision to replace the invalid "billing provision."

.  .  .  .  .  .

Pending finalization of the new regulatory provision, the following policies shall apply:

1. Provisions of State plans which are based on the invalid "billing provision" (42 C.F.R. § 53.111(f)(1)) are to be treated as null and void, and are not to be followed or enforced.

2. In lieu of the current invalid billing provision, State agencies shall apply and enforce the following standards in determining the amount of uncompensated services provided by facilities under the "reasonable volume" regulation (42 C.F.R. § 53.111).

a. There shall be included only those services provided to an individual with respect to whom the applicant (as defined in 42 C.F.R. § 53.111(b)(2)) has made a written determination prior to the provision of such service that such

individual is unable to pay therefor under the criteria established pursuant to 42 C.F.R. § 53.111(g) except that

(1) such determination may be made after the provision of such service but prior to the rendition of a bill where the applicant has for good cause been unable to complete its investigation and determination prior to the provision of the services: *Provided that* a statement of such good cause shall be made a part of the applicant's written determination; and

(2) such determination may be made after the provision of such service and after the rendition of a bill, but prior to any effort to collect such bill, in the case of services provided in emergency departments of general hospitals or where there has been a change in circumstances, e. g., the patient's financial condition has changed, his insurance coverage is less than anticipated, or the cost of the services provided is greater than anticipated.

.  .  .  .

In the interim [before the new regulations are published], please advise all Hill-Burton grant and/or loan recipients that the current billing provisions are invalid and that the hospitals  .  .  .  should *immediately* try to make up the larger share of the quota of uncompensated care expenditures with clear cut instances in which they can make a written determination prior to the provision of services. *The remainder should meet the conditions stipulated in item 2 of the above-stated policy.*

.  .  .  .

Exh. I–9 (emphasis added in last paragraph). A memorandum was sent by the state agency to all Hill-Burton facilities in Tennessee on September 16, 1974, notifying recipients that

An Interim Policy has been issued regarding "Billing Provision" in the Reasonable Volume of Free Care Regula-

tions. This proposed revision makes it obligatory that a written determination of eligibility be made *prior* to the rendition of service except in emergency cases and in cases involving a change in the patient's financial circumstances after service has been rendered.

All sponsors . . . should try to make up their Charity Care Certificate minimum with clear cut, or predetermined, charity cases where no billing has occurred. Billing will no longer be allowed for charity services under these regulations except in emergency cases when the financial status of the patient is unknown and in cases involving a change in the patient's financial status after the bill has been sent.

Please contact this office if you have any questions concerning this matter.

Exh. H–4. Vanderbilt stated in answer to Plaintiff's Second Requests for Admissions that it "has no record of having received any such memorandum" from the state agency, and that the "change in the Defendant's Hill-Burton account procedures to conform to new regulations issued after the decision in *Corum v. Beth Israel* was made by Memorandum dated April 14, 1975 . . . ." Exh. VU–A–II, response 26. Thus the "immediate" action expected by HEW was delayed for seven months, and Vanderbilt continued to operate for at least a year under a judicially invalidated regulation. While Vanderbilt has the benefit of overly lenient regulations for as long as they remain in force, and this court is willing to give the hospital the benefit of a void regulation pending notification several months after the judicial action had become part of the public record, it is unwilling to go further. The state defendants assert that they sent the memorandum of September 16, 1974, to all recipients of Hill-Burton funds in Tennessee. Vanderbilt does not deny that it received the memorandum, but merely states that it has no record of having received it. Based on this evidence the court finds as a matter of fact that defendant Vanderbilt did receive notice of the changed requirements no later than mid-September 1974. The court concedes that the memorandum sent out by the state defendants is somewhat lacking in clarity, but it does state that an *interim* policy had been issued and that the state agency was to be contacted if any questions remained. If defendant Vanderbilt had not understood the exact requirements of the interim policy or when the interim policy was to take effect, it, as a responsible entity, should have made it its business to inquire. The court therefore holds that as of October 1, 1974, Vanderbilt may not count toward its free-care obligation any services for which patients were billed in violation of the interim policy adopted by HEW as set forth in its memorandum of September 5, 1974.

■ The amendments to 42 C.F.R. § 53.-111 promulgated in the wake of *Corum* became effective on October 6, 1975. They imposed two requirements in addition to those included in the interim policy. One of these concerned the bills that could be sent under the exceptions to the "no-billing" provision:

(f) *Qualifying services.* (1) In determining the amount of uncompensated services provided by an applicant, there shall be included only those services provided to an individual with respect to whom the applicant has made a written determination prior to the provision of such services that such individual is unable to pay therefor under the criteria established pursuant to 42 CFR 53.111(g), except that:

(i) such determination may be made after the provision of such services in the case of services provided on an emergency basis: *Provided,* That when billing is made for such service, such *billing must be accompanied by substantially the information required in the posted notice under paragraph (i) of this section* ; and

(ii) such determination may be made after the provision of such services in the case of a change in circumstances as a result of the illness or injury occasioning such services (e. g., the patient's financial condition has changed due to a loss of wages resulting from the illness) or in

case of insurance coverage or other resources being less than anticipated or the costs of services being greater than anticipated. *Further,* in all cases where such determination was not made prior to the provision of services, such services may not be included as uncompensated services if any collection effort has been made other than the rendering of *bills permissible in the above exceptions: Provided,* That such a determination may be made at any time if the determination was hindered or delayed by reason of erroneous or incomplete information furnished by or in behalf of the patient.

\* \* \* \* \* \*

(i) *Posted notice.* The applicant shall post notice . . . in substantially the following form, in appropriate areas within the facility (admissions, office, emergency department and business office) for the purpose of informing patients and potential patients that criteria for eligibility *and applications* are available upon request:

### "NOTICE OF HILL–BURTON OBLIGATION

This hospital (or other facility) is required by law to give a a [sic] reasonable amount of service at no cost or less than full cost to people who cannot pay. If you think that you are eligible for these services, please contact our business office (give office location) and ask for assistance. If you are not satisfied with the results, you may contact (the State Hill-Burton agency with address),"

*Provided, that* an applicant which has selected a presumptive compliance guideline under paragraph (d)(1) of this section may, at its option, either (1) add to such notice language stating that the facility's obligation is limited to a specified dollar volume of uncompensated services and that if the facility has, during a specified period (e. g., year, quarter, month), already provided a volume of uncompensated services sufficient to satisfy such obligation, any person inquiring about such services will be given a written statement to that effect which shall also state when

additional uncompensated services will be available; or (2) post an additional notice stating that the facility's obligation has been satisfied for the current period and stating when additional uncompensated services will be available.

40 Fed.Reg. 46,202, 46,203 (1975) (codified in 42 C.F.R. § 53.111(f), (i) (1976)) (emphasis added). The record shows that defendant Vanderbilt has never included any such notice on any of its bills. The only exception allowed by the regulation is in the case of "erroneous or incomplete information furnished by or in behalf of the patient." The court is of the opinion that Vanderbilt is not entitled to plead this exception in any case, for this provision obviously contemplates that an application form be provided by the hospital designed to solicit the information necessary to determine if the patient qualifies for Hill-Burton assistance and that the form has been erroneously or incompletely filled in. It has been Vanderbilt's policy to say as little as possible to patients about Hill-Burton free care. The deposition of Mr. Hewitt Rogers, Director of Admissions and formerly Director of Patient Admissions and Patient Accounting, contains the following exchange with counsel for plaintiff:

Q. What is sufficient to gain admission to the hospital, the recommendation of the financial counselor, or verification by the credit report, at what stage is the person admitted? I assume you don't make people wait until—

A. On interview the admitting interviewer has guidelines to go by similar to what's in that letter, memorandum [Exh. C–2], and if the patients meet those criteria then they're admitted. If not, then the data and the information is taken to the office supervisor who makes a further judgment about it. Maybe makes some further question to the patient or the guarantor. And would make the decision based on that further investigation to admit maybe by saying, specifically an arrangement to make payment of the balance that they were unable to pay at the time of admission.

Q. What is said to the patient throughout this process about his potential eligibility, the fact that he's being considered for uncompensated care?

A. I would say seldom is it brought into the conversation that they would be considered for uncompensated care at that point because all we have at that point is their word about what they have and what they don't have. What they owe and what they don't owe.

Q. Are they told at any point that they're either being considered for, have been approved for, or denied uncompensated care?

A. Yes, on occasion we know a particular case who may have been in before, and couldn't pay and didn't pay. We would just openly admit, well, we'll accept you and we'll place you on a form of write-off that we have that would cause you not to have to pay.

Q. But in the normal type of case where you don't have this sort of unusual prior knowledge of the patient, you wouldn't normally follow that procedure?

A. That's right. Not at that point.

Q. Okay. At any point would you say anything to the patient about the fact that he was being considered or might request to be considered or had been considered and rejected for uncompensated care?

A. Not at that initial point.

Q. At any point?

A. The purpose being if there is any possibility of their paying, the potential is just wiped out.

Q. Would you explain that?

A. Well, if you're interviewing me for admission and if I have the possibility of payment and you tell me that I would be considered for uncompensated responsibilities, you would diminish my willingness to pay very greatly.

Q. Do you mean you're worried that the person—I don't understand how that would—

A. Well, if you told me that I may not have to pay because I may develop a route that he could get free care here, then I would hear you well. And I wouldn't make much effort beyond that point to pay, particularly if I were a borderline case, and I had two or three or four children, and I really didn't think I could afford to pay. But in the minds of most people I could.

Q. Well, are you saying you're worried about the person falsifying information that they give you in order to qualify for free care or are you just saying that would make everybody feel like it is a free luncheon and they ought not to have to pay?

A. Well, I'm just saying that I think it would diminish my desire to pay to a great extent. And I think I'm human. I think I'm average. I'm not beyond what most people would probably want to do.

Tr. Exh. 11, at 23–26. Any concern that applicants for admission might be tempted to provide false information if armed with foreknowledge of potential Hill-Burton eligibility can certainly be countered with concern that Vanderbilt's current admissions procedures might encourage them to present an overly optimistic financial picture. The record is replete with evidence that applicants for admission are led to believe, and realistically so, that they will be turned away if they are perceived to be unable to pay. Moreover, of the many people who have been denied admission for financial reasons, a significant number have had nowhere else to turn for the needed treatment. See Exhs. E–1–E–6. Under these conditions patients can hardly be blamed for failure to properly document their eligibility for Hill-Burton. The court therefore holds that any amounts for which patients were billed after October 6, 1975, and until such time as the bills bear the proper notice, may not be counted toward the fulfillment of Vanderbilt's free-care obligation.

Plaintiff raises some questions concerning the timing and manner of Vanderbilt's compliance with the requirement that notices be posted in the facility itself. Since it is clear that Vanderbilt has posted notices and has therefore complied to some extent, and

since the impact of any degree of noncompliance with this provision upon the fulfillment of its free-care obligation cannot be determined, the court declines to penalize Vanderbilt on this basis. Nonetheless, the sufficiency of the posted notice provision itself as an element of due process will be examined in Section IV of this memorandum.

█ Plaintiff has proved that defendant Vanderbilt has included certain amounts in its reports of Hill-Burton uncompensated services that were billed in violation of regulations and, therefore, that to some extent at least the figures used by Vanderbilt in reporting its compliance to the state agency and to HEW were inflated. It is now defendant hospital's burden, as it was already its duty, to demonstrate that it has complied with its free-care obligation. The records indicating which accounts were billed in violation of regulations and which were not are certainly in possession and control of defendant and more readily accessible to them than to plaintiff. If no such records exist then Vanderbilt must be held to have been in noncompliance for the entire amount of its obligation for the period in question, for the obligation to provide the care is necessarily coupled with a requirement that the hospital record and report the amount of such care it has provided. 42 C.F.R. § 53.111(e). If it failed to keep the proper records then it must bear the consequences.

█ When Vanderbilt elected the "10% option" under the presumptive compliance guidelines, which committed it to provide $318,100.96 in uncompensated care annually (until the oldest of its grants was over 20 years old or until it elected another of the methods of compliance), it "made representations to the state Hill-Burton agency that . . . it would provide [annually] a volume of uncompensated services equal to $400,000 on the basis of *charges for such services.* Such proposed compliance was

approved by the state Hill-Burton Agency by letter dated October 26, 1973 . . . .." Stipulations of Fact, at p. 2 (emphasis added). Applicable regulations leave no doubt that compliance is to be determined on the basis of "reasonable cost" rather than charges. 42 C.F.R. § 53.111(b)(6), (7). The state defendants were therefore without authority to accept compliance reporting based upon charges. The federal defendant was likewise in error to find Vanderbilt in substantial compliance on the basis of figures representing charges. All the parties seem to agree that the charges reported by Vanderbilt can be converted to cost figures by multiplying the charges by a reasonable cost rate of approximately 75%,[12] and everyone except plaintiff seems satisfied that, since the figures reported by Vanderbilt[13] more than satisfy the annual compliance requirement after the cost percentage adjustment is made, there is no problem with the charge basis approach. Plaintiff's objection is that the reporting of charges rather than costs "obfuscates" the actual extent of Vanderbilt's compliance, possibly by lulling the agencies into forgetting that the reported figures are charges instead of costs. The court offers no opinion of the seriousness of this danger because it is concerned with another problem inherent in the charge method of reporting as utilized by Vanderbilt. In response to plaintiff's Second Request for Admissions, defendant Vanderbilt admitted that the difference in charges over costs paid by Medicare, Medicaid, and other third parties is counted in satisfaction of the hospital's uncompensated service obligation. *See* Vanderbilt's Response to Plaintiff's Second Requests for Admissions (VUA–ii), response 27. When this amount, which the record indicates is substantial, is included in the total amount of uncompensated services reported and the total is then adjusted by application of the cost basis percentage, the resulting figure, which should represent only the cost of services rendered, also still includes 75% of

---

12. *See* Plaintiff's Post-Trial Brief, at 36; Decision of HEW, Tr. Exh. 14, at 3.

13. Vanderbilt reported $746,000 in free or below cost services for fiscal year 1973–74, $457,435 for 1974–75, and $458,885 for 1975–76. Tr. Exh. 12.

the *above cost* charges for services covered by Medicare, Medicaid, and other third party payors. This results in genuine inflation, not just the psychological inflation apparently of concern to plaintiff. For example, assume that the charges for a patient's care totalled $100, that $75 had been paid by Medicare, and the remaining $25 included in the hospital's report of charges for Hill-Burton services. When the reported figure was adjusted to represent "reasonable cost," $18.75 of the $25 over-cost figure remained in the amount credited toward the hospital's Hill-Burton obligation. Similarly, if Medicare had paid less than the reasonable cost of the patient's care, say $50 of the $100 charge, and the hospital included the unpaid $50 in its Hill-Burton report, then $37.50 remained after converting the total from charges to costs. Of this $37.50, $25 represented services on a cost basis, but $12.50 was above cost. This amount, like the $18.75 in the first example, may not properly be counted toward a facility's free-care obligation.

It is the decision of the court that defendant Vanderbilt shall submit to the state Hill-Burton agency, to HEW, and to this court, reports of the reasonable cost of services rendered by it for each fiscal year from July 1, 1973 to date pursuant to its free-care obligation under the Act. Each such report shall include only those services that hospital records document to be qualified as Hill-Burton uncompensated services under the applicable regulations as set out earlier in this opinion, and each report shall be accompanied by an affidavit that the report contains only services that are so documented. If the reports show that Vanderbilt did not fulfill its free-care obligation for any period, the state and federal defendants shall take appropriate action whereby the deficit volume of services will be rendered within a reasonable period of time. The exact nature and details of this action will be left to the discretion of the agencies as more within their expertise and capabilities but shall remain subject to review in this court.

Vanderbilt will not be hard pressed financially by being required to make up its noncompliance, if any, for the few years in question. Mr. Paul Gazzerro, Vanderbilt University's Associate Vice Chancellor for Medical Affairs for Operations and Fiscal Planning, acknowledged in court that the 10% compliance option was selected to minimize the hospital's losses. He had previously stated during his deposition that, "You know, $400,000 on a $30,000,000 operation is a modest amount of money." Tr. Exh. 5, at 11. The court, of course, has no quarrel with Vanderbilt's desire to cut its losses. The provision of options under the presumptive compliance guideline, *supra* note 10, obviously anticipates that many facilities will elect the least expensive method of compliance. The very modesty of Vanderbilt's obligation, however, underscores the necessity for insuring that it is fully and fairly provided. To the indigents the program was designed to serve, the cost of medical care is not a relatively modest expense.

## IV. STATE ACTION AND DUE PROCESS

It is plaintiff's contention that whether or not Vanderbilt University Hospital has provided a reasonable volume of free services to persons unable to pay, the manner in which it has provided Hill-Burton uncompensated care deprives indigent persons of their rights under the due process provisions of the fifth and fourteenth amendments and violates the Hill-Burton Act. The due process requirements of the fifth and fourteenth amendments may not be imposed upon Vanderbilt unless its allocation of Hill-Burton services constitutes federal and state action.

### A. State Action

Judicial opinion has been divided on the question of whether the receipt of Hill-Burton funds by private hospitals is in itself sufficient governmental involvement to invoke the state action doctrine. *Cf., e. g., Holton v. Crozer-Chester Medical Center,* 419 F.Supp. 334, 341 (E.D.Pa.1976) (no); *Bricker v. Sceva Speare Memorial Hospital,*

339 F.Supp. 234, 237 (D.N.H.1972) (yes, by weight of authority). The Sixth Circuit Court of Appeals has dealt with the question of state action in the Hill-Burton context in four opinions, *Jackson v. Norton-Children's Hospitals, Inc.*, 487 F.2d 503 (6th Cir. 1973); *O'Neill v. Grayson County War Memorial Hospital*, 472 F.2d 1140 (6th Cir. 1973); *Chiaffitelli v. Dettmer Hospital, Inc.*, 437 F.2d 429 (6th Cir. 1971); and *Meredith v. Allen County War Memorial Hospital Commission*, 397 F.2d 33 (6th Cir. 1968). In both *O'Neill* and *Meredith* state action was found, but in both cases the defendant hospitals were county rather than private facilities. In *Chiaffitelli* defendant asserted that it was a private hospital, but the court ruled that the institution was subject to suit under 42 U.S.C. § 1983 on the basis of plaintiff's allegation "that five of the nine members of the hospital's board of governors are, under the hospital's charter, responsible to the public: four are appointed by the Miami County Commissioners, and the fifth is the Judge of the Common Pleas Court of Miami County." *Id.* at 430. The court held that, "Under applicable case law, this is enough to give the hospital the character of a public agency. [citing *Meredith, supra*]." *Id.* Thus *Norton-Children's* is the only Sixth Circuit case involving a truly private hospital: The court held that "the action of the defendant hospital did not constitute state action within the meaning of Sec. 1983, notwithstanding the receipt by the hospital of Hill-Burton funds and the existence of state regulations governing hospitals. . . . Whenever state action has been discovered in the activities of an ostensibly private hospital something more than a partial federal funding is involved." 487 F.2d at 503. The question before this court is whether that "something more" exists in the instant case, and it is the opinion of the court that it does.

It is true that Vanderbilt Hospital is subject to extensive governmental regulation in addition to its dependence on public funds. It is also true that in the absence of such regulatory involvement, a finding of state and federal action would be less likely. However, regulation cannot be the "something more" required by the Sixth Circuit in *Norton-Children's*, for virtually all health care facilities are so regulated.[14]

The Supreme Court in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), stated:

The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for the purposes of the Fourteenth Amendment . . . [citing *Moose Lodge v. Irvis*, 407 U.S. 163, 176–77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)]. Nor does the fact that the regulation is extensive and detailed . . . .. But *the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.* [*Citing* Moose Lodge, supra, *at 176*].

*Id.*, at 350–51, 95 S.Ct. at 453 (emphasis added). The plaintiff in *Norton-Children's*, as in the three Sixth Circuit cases involving public hospitals, was a physician claiming that he had been improperly dismissed from the staff of the defendant hospital. The nexus between that activity and the government is tenuous at best compared with the nexus between the government and the allocation of free care pursuant to the Hill-Burton Act, the challenged activity in the instant case. Vanderbilt would not be engaged in this activity at all were it not for the hospital's receipt of government funding, and this activity is itself the subject of direct regulation. Thus Vanderbilt's method of allocation of Hill-Burton free care would appear to be devised, and indeed should be devised, with governmental approval and in many respects with outright governmental direction. This court is therefore of the opinion that the "something more" test of *Norton-Children's* is amply met in this situation.

Even if the government involvement test were not met here, the activities

---

14. *See* Stipulations of Fact, at pp. 4–5 for details of Vanderbilt's governmental involvement.

of Vanderbilt Hospital constitute state action under the well-recognized "public purpose" doctrine. This doctrine acknowledges state action in the practices of a private entity whenever that entity undertakes to perform a state function. *See, e. g., Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In order to decide whether an institution serves a "state function" one must resort to state law to determine whether the state considers itself responsible for providing such a service. *Jackson v. Metropolitan Edison Co., supra.*

█ It is clear under Tennessee law that the Hill-Burton hospitals of this state undertake to serve a "state function" which infuses their practices and policies with the characteristics of state action. In *Bedford County Hospital v. Browning,* 189 Tenn. 227, 225 S.W.2d 41 (1949), the state's supreme court upheld the constitutionality of the state statute implementing the Hill-Burton Program and rejected the assertion that it was invalid because it pledged the state's credit for the benefit of private corporations:

> Construing these two Acts [the state Hill-Burton statute, T.C.A. § 53.1201, *et seq.,* and the following chapter providing for regulation of hospitals] together, they authorize the development of an overall plan, the prospect being for Federal Aid, and after the erection of such hospitals, they can be regulated under the provisions of Chapter 13, Public Acts of 1947.

*Id.* at 42.

> The [Hill-Burton] project is accomplished through direct State act and under State control. It is for a State purpose and not to further the end of any private individual for gain or profit. The purpose of the Act is to provide the public of the entire State with better hospital facilities, *which is not only a legitimate State purpose but in fact a State duty.* The Act seeks to perform this function through the agencies of cities and counties and hospitals owned by general welfare cor-

porations, under State supervision and control, rather than the much more expensive method of the State itself directly building and owning the hospitals required to serve the people.

*Id.* at 43 (emphasis added). The court concluded that the statute was valid under the State Constitution on these grounds:

> 1) That the Act is for the accomplishment of not only a public but a State purpose as well.
>
> 2) That the hospitals become the agencies and instrumentalities of the State for the accomplishment of such State purposes under State control, regulation and supervision.
>
> 3) That the objection that the sovereign has no title to the institutions is met by the proposition that it will continue to have the use of the hospitals for the benefit of the people of the entire State.

*Id.* at 45–46. *See also Fort Sanders Presbyterian Hospital v. Health and Education Board,* 453 S.W.2d 771, 776 (Tenn.1970).

It has been recognized in federal courts that:

> The Hill-Burton Act provides federal grants to state agencies to assist in creating statewide systems of hospital care to reach *all the people* of a state. The program was designed to induce the states to assume, *as a state function,* the burden of supervising the maintenance and construction of hospitals throughout the state. [Citations omitted.] The money is funneled through the state agencies to individual hospitals which are engaged in building projects. A state, in order to qualify for funds, must have a statewide plan of hospital construction approved by the Surgeon General of the United States.

*Mulvihill v. Julia L. Butterfield Memorial Hospital,* 329 F.Supp. 1020, 1022–23 (S.D.N.Y.1971) (emphasis added). *See also, e. g., Ward v. St. Anthony Hospital,* 476 F.2d 671, 675 (10th Cir. 1973); *Barrett v. United Hospital,* 376 F.Supp. 791, 802 (S.D.N.Y.1974); *Slavcoff v. Harrisburg Polyclinic Hospital,* 375 F.Supp. 999, 1003 (M.D.Pa.1974). In these cases, as in the four Sixth Circuit

cases discussed *supra*, plaintiffs were physicians complaining that staff privileges had been improperly denied them. In each case the downfall of plaintiff's claim of state action was the missing link between the activity complained of and the delegated state function. The court stated in *Mulvihill* that the presence or absence of this nexus is the "crucial distinction" between cases where state action exists and those where it does not. 329 F.Supp. at 1023. The nexus between the challenged activity and the state function being performed by the defendant hospital is just as clearly present as the nexus between the activity and the governmental involvement previously discussed. Furthermore, whether the provision of medical care to "all" the people of the state is carried out by the state directly or is delegated by it to private facilities in receipt of Hill-Burton grants, the provision of a reasonable volume of free care to the indigent is a required function under the Act.[15] Thus it is state action because it is compelled, not merely authorized, acquiesced in, or encouraged, by the state. *See, e. g., Flagg Brothers, Inc. v. Brooks,* — U.S. —, —, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 357, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

■ On the basis of Vanderbilt's governmental involvement, particularly its administration of its Hill-Burton free-care program, reinforced by its role in thereby performing a state function, this court holds that if the fifth and fourteenth amendments require that due process be provided in the allocation of Hill-Burton free care, such requirements may be properly imposed upon defendant Vanderbilt. This determination leaves open two questions: first, whether the fifth and fourteenth amendments do in fact require that indigents be afforded due process in the distribution of Hill-Burton free care, and if so, what constitutes due process to such persons.

## B. Due Process

Defendants argue that because the hospital's obligation is only to provide a reasonable volume of free care, which as a practical matter in the present case is far short of the need for such care, individual indigents have no entitlement to such care and are therefore not entitled to due process under the fifth and fourteenth amendments. Defendants assert in the alternative that the hospital's present procedures, which it alleges conform to the requirements of the statute and the regulations, provide due process. This court disagrees on both points.

■ To determine whether members of the plaintiff class have a constitutionally protected property interest in needed free or below-cost hospital care, one must look beyond the Constitution itself to other sources of law, regulations or custom. As the Supreme Court noted in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), constitutionally protected property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlements to

---

**15.** The legislative history of the National Health Planning and Resources Development Act of 1974 contains the following background on the Hill-Burton Act:

Congressional interest in effective health planning and resources development began with the enactment of the Hill-Burton program in 1946. Not only did this program provide funds for the construction of needed new hospitals but it clearly contemplated that the States which received those funds would use them in accordance with a plan-

ning process by which the States would be surveyed with respect to their need for an existing supply of medical facilities, and plans drawn based on these surveys which would use the available funds to fill unmet needs.

Senate Report, *supra,* at 7845. The inclusion of the free-care provisions in both Acts makes it plain that one of the needs Congress felt to be unmet in 1946, and still inadequately met in 1974, was the need for medical care for indigents.

those benefits." 408 U.S. at 577, 92 S.Ct. at 2709. *See also Paul v. Davis,* 424 U.S. 693, 710 n. 5, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ Applying the *Roth* directive in this case, it is evident that plaintiff and the class of indigent persons she represents have a constitutionally protected right to needed uncompensated services under the Hill-Burton Act. The Act itself defines persons entitled to uncompensated care as being those "unable to pay therefor," a statutory standard of eligibility which the plaintiff class, by definition, meets. Further definition of the standard was delegated to the states by federal regulation. 42 C.F.R. § 53.111(g)(1). Pursuant to such authority, the Tennessee Department of Public Health has developed specific financial eligibility criteria (Stipulations of Fact at p. 3), which are also satisfied by plaintiff. Plaintiff's Answers to Vanderbilt's First Set of Interrogatories, responses 3, 4, 6, 7. In fact, even under Vanderbilt's own selection practices, such as they are, plaintiff Newsom would have been eligible for uncompensated services, as acknowledged by the hospital's Director of Financial Management. Forsyth Dep., Tr. Exh. 4, at 20–21. Thus, Mrs. Newsom's claim to Hill-Burton uncompensated services is rooted in both statute and regulation, and constitutes a right enforceable by her through the judicial process. *See generally* 42 U.S.C. § 300p–2(c); *Saine v. Hospital Authority of Hall County,* 502 F.2d 1033 (5th Cir. 1974); *Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972); *Corum v. Beth Israel Medical Center,* 359 F.Supp. 909 (S.D.N.Y.1973); *Cook v. Ochsner Foundation Hospital,* 319 F.Supp. 603 (E.D.La.1970), 61 F.R.D. 354 (E.D.La.1973); *O.M.I.C.A. v. Smith Hospital,* 325 F.Supp. 269 (S.D.Fla.1971). Her claim must, therefore, be afforded the protections prescribed by the due process provisions of the Constitution.

■ This is not to say that plaintiff or other members of the class of indigent persons have an absolute right to Hill-Burton uncompensated services from defendant Vanderbilt Hospital or from any other Hill-Burton facility. This right is limited by the extent of the free-care obligation of Hill-Burton facilities in relation to the need for uncompensated care in their service areas. As in the case of public assistance payments, *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), limited fiscal resources implies the denial of Hill-Burton benefits to some members of the class of persons unable to pay. But as with welfare, the denial of a right once recognized by statute and regulation can only be effected through procedures conforming with due process requirements to insure that available resources are not allocated arbitrarily. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ Having established that members of the plaintiff class have a right to uncompensated care that is protected by the due process provisions of the fifth and fourteenth amendments, it becomes necessary to determine what process is due such persons. This determination must be based on an assessment of the nature of public activity that is involved vis-a-vis the private interests implicated in that activity. *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In the present case, plaintiff's interest in the fair and consistent allocation of necessary hospital services must be weighed against the defendant hospital's interests in determining eligibility for such services on an ad hoc basis, which the record demonstrates has been the case.

There is no disputing the critically important nature of the individual interest here at stake. "[M]edical care is as much a 'basic necessity of life' to an indigent as welfare assistance." *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 259, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). The person whose rights are at stake has a need no less "brutal" than that of a welfare recipient seeking continued public assistance. *See, Goldberg v. Kelly, supra,* 397 U.S. at 260, 90 S.Ct. 1011.

The need for procedural regularity in the allocation of Vanderbilt's limited Hill-Burton services is particularly important in light of the unique role played by the hospital in the delivery of care within a large geographic area. The hospital is a referral center for cases from Southern Kentucky, Middle Tennessee and Northern Alabama, and in certain types of cases, even more distant areas. Exh. B–4, at p. A–20; Exh. B–25, "Patient Care." The need for uncompensated care within Davidson County alone far exceeds the amount of Vanderbilt's obligation to provide such care, and many of the patients referred from outlying areas are also indigent. Stipulations of Fact, at pp. 2–3, Forsyth Dep., Tr. Exh. 4, at 49. To place this imbalance between supply and demand in its proper context, one must keep in mind that many patients referred to Vanderbilt are sent there because no other facility has the medical resources to treat them. Gazzerro Dep., Tr. Exh. 5, at 13. These medical resources, of course, were developed in part with Hill-Burton subsidies that were allocated to Vanderbilt rather than other facilities in the state.

It is the opinion of this court that due process dictates that indigent persons may be denied necessary medical treatment under the Hill-Burton Act only if they are afforded meaningful notice of their potential eligibility to receive care and of the written eligibility criteria upon which the hospital will base its determination to furnish or withhold treatment. Such persons must also be given timely and adequate written notice detailing the reasons for the proposed denial of benefits, review by a decision-maker who has not participated in making the initial finding of ineligibility, and a written statement of the reasons for the decision and the evidence relied on. See Goldberg v. Kelly, 397 U.S. at 267–271, 90 S.Ct. 1011. At the core of due process is of course a requirement that individuals be given an effective opportunity to present affirmative evidence and to refute adverse evidence, though not necessarily at an oral hearing. See Mathews v. Eldridge, supra, 424 U.S. at 348, 349, 96 S.Ct. 893.

These procedures can be accommodated to the need, shared by patient and hospital alike, for prompt processing of requests for treatment. Vanderbilt already utilizes a process of screening prospective patients for the purpose of restricting indigent admissions. This process could be modified without major cost or inconvenience to the hospital to insure that the facility provides a reasonable volume of Hill-Burton care as required, and to provide the necessary constitutional protection to persons denied such care. See Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

The procedural protections set forth above (and elaborated upon below) are not only required by the Constitution but are necessary to the fulfillment of the purposes of the Hill-Burton Act itself. Unless an indigent person is afforded an opportunity to know what substantive criteria are being used to determine whether he will receive some of the limited Hill-Burton benefits, it is impossible for him—or for regulatory authorities—to assure that his demand for needed services has been accorded fair treatment. Without written, published standards, the personal biases and predilections of individual hospital staff could serve as the bases for denial of needed uncompensated services under the Act. An opportunity to be heard would be meaningless, since in the absence of predetermined criteria, the indigent person's objections to a denial of care could be answered simply by an ad hoc revision of the reasons for the denial. It has already been held that the Act requires a written determination of eligibility and that the determination of what services are to be provided must be based on criteria developed by the governmental regulatory agencies. See Corum v. Beth Israel Medical Center, 359 F.Supp. 909, 917 (S.D.N.Y.1973). The regulations promulgated under the Act in 1972, effective in 1973, require that such criteria be developed by the state agency and that a copy of the criteria be made available by the state agency "to any person requesting it," and by the Hill-Burton facility itself to any patient, former patient, or person seeking

services, "*upon request.*" 42 C.F.R. § 53.-111(g). It has also already been held that some type of notice to eligible persons is necessary to insure implementation of the Act's provision for indigent care. *See Gordon v. Forsyth County Hospital Authority, supra,* 409 F.Supp., at 725. As discussed and quoted in section III–B of this opinion, the regulations provide for notices of a Hill-Burton recipient's free-care obligation to be posted in appropriate places within the facility and to be placed on bills sent to patients potentially eligible for such care but who for specified reasons have not been determined to be eligible prior to the rendition of services. Annual notice by publication is also required, 42 C.F.R. § 53.-111(h)(4). The question the court must now address is whether these forms of notice, and particularly the posted notice provision, are sufficient to afford due process in light of the avowed purpose of the Act to encourage the provision of adequate medical services for *all* and its mandate that recipients of Hill-Burton funding provide a reasonable volume of uncompensated services to persons *unable* to pay therefor.

▮ The court finds no problem with the provision in 42 C.F.R. § 53.111(f) for notices on bills when such notices do in fact appear on bills as required. Similarly, the provision in 42 C.F.R. § 53.111(g)(2) whereby facilities are required to make copies of criteria available upon request is adequate where indigents receive meaningful notice that such criteria are available. However, it is the opinion of this court that the posted notice provision of 42 C.F.R. § 53.111(i) is woefully inadequate as the keystone of the notice provisions.

The court is aware that the promulgation of the posted notice provision was due in large part to repeated requests for it by representatives of the poor and that it was given a judicial stamp of approval in *Gordon v. Forsyth County Hospital Authority, Inc.,* 409 F.Supp. 708 (M.D.N.C.1976). The *Gordon* court stated:

Although there is certainly no requirement that all members of the public have actual notice of the benefits available under the Hill-Burton Act, it is obvious that a simple written notice displayed in appropriate areas within the Hill-Burton facility would be an effective and satisfactory means of informing the public of the availability of the program. Such notice would be far more effective in communicating information to needy and qualified persons than the annual notice printed in the legal notice section of one local newspaper. Posting of such notice is contemplated by a proposed amendment to the Regulations . . . .

*Id.* at 725. This court, of course, agrees that posted notice is an improvement over notice by publication,[16] and were this court in the position of the *Gordon* court of examining the posted notice provision as it appears in theory rather than as it has functioned in practice, agreement might exist on its effectiveness as well. However, the factual record of this case establishes that posted notices simply do not work in the context of Hill-Burton free care. While the regulations may have been reasonable when promulgated and as yet untried, it is unreasonable for the Secretary to allow posted notice to remain the primary means of notifying indigents of a facility's Hill-Burton obligation.

In his deposition taken on October 22, 1976, Vanderbilt Hospital's Director of Admissions stated that there were at that time notices posted in the admitting office, in the clinic, in emergency service, and in the cashier's office. He described these notices as being "eight and a half by eleven" and typed in capital letters. Roger's Dep., Tr. Exh. 11, at 27, 28, 30. When asked if they were posted where most patients would see them he replied, "In the Admitting Office it is in the so-called waiting room where any

16. As an adjunct to a more effective notice medium, the posted notice provision would be of some value. This is not the case with notice by publication under 42 C.F.R. § 53.111(h)(4). Notice by publication as a means of communicating with persons having no reason to check legal notices regularly is an anachronistic practice. Its continued use in situations where better means are readily available is an almost pointless legal fiction.

patient who would be there could see it or as they pass through they could see it, uh-huh. Emergency service I would say, and I'm not sure where the one is in the clinic, at this point I don't know whether I could tell you exactly where it is." *Id.* at 28. In the decision rendered by HEW pursuant to plaintiff's complaint concerning Vanderbilt, the hospital was found to be in compliance with the posted notice provision. The report states that a site visit and two follow-up visits were made and that:

At the time of the site visit, notices were posted in both the business [cashier's office] and admission areas. They were in black frames, about 8″ × 10″ in size, but neither sign was readily located or readable at a short distance. There was no sign in the emergency area. However, on his second follow-up visit, the State Agency representative observed that a large, legible [sign] (from 10′ or more) was placed in a prominent position in the emergency area, and readily legible signs placed in the admissions and business areas. The signs contained the required information.

Tr. Exh. 13, at 8.

The deposition of Alice Dixon, Vanderbilt Hospital's "Service Representative," taken on January 5, 1977, contains the following exchange between the witness and counsel for plaintiff. (Ms. Dixon's subsequent in-court testimony indicates that as Service Representative she "pre-admits" patients; that is, she fills out necessary forms, checks insurance coverage, and takes a complete credit review to see if the patient is eligible for assistance from third party sources. She is the person who makes a determination of potential Hill-Burton eligibility at admission and notes accordingly on the patient's file.)

Q. Do you know of any way that the patient might know about the existence of the hospital's Hill-Burton obligation?

A. Well, we have a sign up in the main part of the hospital in the Admitting Office. No other way that I know of.

Q. Do you know of anywhere else where there's a sign?

A. There's several in the hospital. I couldn't tell you the locations.

Q. Have you ever had a patient mention to you that he or she had seen the sign and wants to apply for Hill-Burton care?

A. No.

Q. Is this sign in a conspicuous location?

A. Yes.

Q. How big is it?

A. About this big (indicating).

Q. You're motioning with your hands approximately eight inches by six inches?

A. Uh-huh.

Q. Is that correct?

A. Yeah.

Q. And is that typed?

A. Yes.

Q. With just a regular—

A. No, it's big print.

Q. But this is typewriter, like pica or elite type?

A. It's not elite.

Q. Is it—

A. I'm not sure it wasn't printed. I don't know.

Q. Do you know what the notice says?

A. It says, we are a member of the Hill-Burton, and we comply to their standards.

Q. You mentioned earlier that you don't mention the existence of the hospital's Hill-Burton obligation to the patients. Are you following hospital policy when you do that?

A. I've never been—I think I am.

Q. Why do you think you are?

A. I don't remember reading where I should have, so—

Tr. Exh. 10, at 33–35. Mr. George Forsyth, Vanderbilt's Director of Financial Management, testified in court concerning "the form now used to designate Hill-Burton accounts," stating that the first page of the form is filled out by a financial counselor or clerk on the basis of Ms. Dixon's notation on the ledger. Financial counselors consult with patients after admission about prob-

lems in meeting their medical expenses. The January 5, 1977 deposition of Katherine Starkey, a financial counselor, contains this passage:

[COUNSEL FOR PLAINTIFF]: (To the reporter) Would you read back the last question? (Last question read by reporter. [Q. Are you saying that the only people that you ever tell about the existence of the Hill-Burton fund are those patients that you have already identified and recommended for Hill-Burton care?])

A. I would have no reason to tell anyone else.

Q. Your answer is, yes?

[COUNSEL FOR DEFENDANT VANDERBILT]: I think she's answered the question.

Q. Is that your answer—yes?

A. That's my answer right there. I would have no reason—

Q. And so you don't?

A. I don't have time to go up and tell anyone, and signs are posted in the hospital about Hill-Burton care, if they want information.

Q. Where are those notices posted, Ms. Starkey?

A. Well, there's a big one in the Admitting Office.

Q. How big is that?

A. Well, I wouldn't know the exact size, but it's there available for everyone to see.

Q. Well, you just characterized it as big.

A. And they're also in the—I believe I recall. I wouldn't want to say on oath, but I think I recall seeing one down in the Emergency Room, although I do not go down there very often.

Q. Do you know if there's one in the Cashier's Office? [The proof establishes that at the time of this deposition, the notice posted in the Cashier's Office had been there for several months.]

A. The Cashier's Office?

Q. Yes, ma'am.

A. Well, it would be pointless for one to be in there. I really do not believe there's one in the Cashier's Office, but patients are not admitted to the Cashier's Office, so this would not—

Q. That would not serve any purpose?

A. No, that would serve no purpose.

Q. Do you go to the Cashier's Office frequently?

A. Do I?

Q. Yes.

A. Yes.

Q. How often?

A. Well, sir, I would say on a given day I may go in and out as many as 20 times a day.

Q. Is there anything wrong with your vision or your powers of observation?

A. No.

Q. You described the notice in the Admitting Office as big. What do you mean by big?

A. I mean, it's large.

Q. Would it be the size of eight and a half by eleven?

A. Sir, I would say it's possibly this wide and about so high.

Q. You are gesturing approximately a foot and a half by—

A. See this? I would say it's approximately in—on a poster-type thing, about like this.

Q. You're holding up a file folder which is roughly eight and a half by eleven?

A. Yes, this is just observing. I've never measured it. I really wouldn't know, but its—

[COUNSEL FOR VANDERBILT]: I think we're wasting a lot of time. The poster is out there. You can go out and measure it.

A. You could go out there and see. It's right there on the bulletin board.

Q. Has any patient ever mentioned to you ever having seen this notice?

A. No.

Q. Has any patient ever inquired of you about the Hill-Burton program?

A. No.

Tr. Exh. 9, at 37–40. The hospital's Director of Admissions, Mr. Hewitt Rogers, had stated in his deposition two and a half months earlier that to his personal knowledge "six or eight" patients had requested uncompensated care after having read a posted notice. Tr. Exh. 11, at 30.

The significance of these depositions to the issue of the effectiveness of the posted notice provision is heightened by the fact that in the three months preceding Mr. Roger's statement, 62 applicants were denied admission to Vanderbilt Hospital for financial reasons, and 43 more were denied on the same basis during the period of slightly over two months between his deposition and the deposing of Ms. Dixon and Ms. Starkey. See Exh. E–3, E–4, E–5. See also Exh. E–5 (an additional 106 were turned away during the following six months). Yet only a handful at most inquired about Hill-Burton free care. Faced with this kind of evidence, it is hard for this court to imagine that anyone would seriously contend that indigents have reasonable notice of Vanderbilt's Hill-Burton obligation to provide a reasonable volume of free care. Armed with hindsight the court can easily see the fallacy of expecting posted notices to be effective. The conditions under which anyone, indigent or not, enters a hospital are seldom if ever conducive to calm, level-headed reflection. Those unable to pay for the services they are seeking are even more likely than others to be distressed. Yet the posted notice provision presumes that in this situation the patient (or equally distressed relative seeking to admit a patient) will perform four steps necessary to render the posted notice actually meaningful: First, he must see the notice. Second, he must be able and have sufficient curiosity to read the notice. Third, he must understand the notice. And fourth, he must act on the notice by inquiring at the designated office. If this office is closed he must take still a fifth step of further inquiry. Each of these steps can be seen by anyone with a realistic view of human nature as a potential stumbling block between a patient and any real chance just to apply for Hill-Burton care.

While the court cannot and will not prescribe in detail the exact nature of the regulations required to provide due process under the Act, see Corum, supra, 373 F.Supp. at 564, the court holds the present notice provision to be insufficient and further holds that at the very minimum those applicants who would otherwise be denied admission for financial reasons and who are not eligible for free or below cost care at another facility in the area capable of providing the needed care must be given actual notice of the facility's Hill-Burton obligation. As noted herein, the allocation of Hill-Burton free care among qualified persons is to be determined by the state and federal agencies. See, e. g., Gordon v. Forsyth County Hospital Authority, Inc., supra, 409 F.Supp. at 722; Corum v. Beth Israel Medical Center, supra, 359 F.Supp. at 719. It may be their determination that a broader classification of persons, such as all those who would otherwise be denied admission or transferred to another facility for financial reasons, be given actual notice, and that decisions concerning allocation of the particular facility's limited services be postponed at least until after the patient has filled out an application for Hill-Burton care. Indeed, for the sake of simplicity, the regulations might require that notices appear on the signature page of the application for admission to the facility. This approach might well be the most reasonable for facilities such as Vanderbilt where treatment is often extended and expensive, and a relatively high percentage of Hill-Burton patients become eligible after admission under the "changed circumstances" exception to prior determination. 42 C.F.R. § 53.111(f)(1)(ii). (The court notes that the posted notices are especially ineffective where these patients are concerned.) Such regulations should include some provision to insure that the notice actually be read by (or to) any patient who would otherwise be unable to obtain or continue needed care for financial reasons. Similar procedures are commonly in use in many health care facilities regarding notice of their limited tort liability.

Once a patient has notice and requests to apply for Hill-Burton care, he must be given a copy of the eligibility standards and an application form, which as indicated in section III of this opinion, must be designed to elicit the necessary information. If he is approved he must be so notified in writing. If he is not approved he must receive written notice within a reasonable time, and the notice must set forth the reason(s) for the decision and the review procedures available. Considering the delay involved in achieving review by the state agency or HEW and the nature of the need involved, the court is of the opinion that at least one review step should be available within the facility or at least within the community in which the facility is located. This local review may be conducted by hospital personnel who did not participate in the initial decision to deny the application. The decision on local review should also be presented to the applicant in writing and should, in the case of denial, detail reasons and procedures available for obtaining impartial review by the state and/or federal agencies. The court would note that defendant Vanderbilt already utilizes a multistep approval process for Hill-Burton accounts that could be adapted to provide for local review. The primary differences in the present procedure and the procedure required by the due process clauses are (1) Vanderbilt currently "reviews" only those cases that have been *approved* by the lower decisionmaker, and (2) the patient receives little if any information concerning the decision process or the decision itself. In fact he may never know he was considered for Hill-Burton free care at all. For anyone to contend that such treatment constitutes due process borders on the absurd.

## V. MANDAMUS

Plaintiff asks the court to use its power of mandamus to remedy the failure of the state and federal defendants properly to regulate, monitor and enforce the free-care provision. The past performance of these defendants leaves much to be desired, but the court does not regard mandamus relief as appropriate at this time. The

most disturbing example of current agency foot-dragging is the failure of the Secretary of HEW to promulgate regulations pursuant to 42 U.S.C. § 300*o*-1(6). Section 300*o*-1, part of the National Health Planning and Resources Development Act of 1974, provides in pertinent part as follows:

*Promulgation of regulations; required provisions*

The Secretary shall by regulation—

. . . . .

(6) prescribe the general manner in which each entity which receives financial assistance under this subchapter or has received financial assistance under this subchapter or subchapter IV of this chapter shall be required to comply with the assurances required to be made at the time such assistance was received and the means by which such entity shall be required to demonstrate compliance with such assurances.

An entity subject to the requirements prescribed pursuant to paragraph (6) respecting compliance with assurances made in connection with receipt of financial assistance shall submit periodically to the Secretary data and information which reasonably support the entity's compliance with such assurances. The Secretary may not waive the requirement of the preceding sentence.

Had the Secretary taken no steps toward complying with the mandate of this statute, the court would have issued its own mandate that he do so. However, pursuant to the court's order an affidavit was filed on behalf of the Secretary stating that proposed regulations have been drafted and that a Notice of Proposed Rulemaking is soon to be published in the Federal Register. A copy of the proposed regulations was attached to the affidavit, but of course judicial comment on them is premature at this time.

## CONCLUSION

Pending the submission by defendant Vanderbilt of the required reports and, if appropriate, subsequent agency action

thereon, as discussed in section III–B of this opinion, this court will retain jurisdiction of this cause. Defendant Vanderbilt is hereby enjoined from reporting services as Hill-Burton uncompensated care unless such services qualify and are shown by the hospital's records to qualify under the Act and current regulations, and it is enjoined from reporting Hill-Burton uncompensated care on any basis other than that prescribed in the Act or current regulations promulgated under the Act. Defendant Vanderbilt is further enjoined from bringing, or having brought on its behalf, any action to collect amounts owed by any patient for services that would have qualified as Hill-Burton care but for the improper acts of defendant hospital. The state and federal defendants are enjoined from finding Vanderbilt to be in compliance with its free care obligation on the basis of reports and/or hospital records that do not clearly evidence compliance under the Act and current regulations.