177 N.J. Super. 289 (1981)
426 A.2d 526
THE HOSPITAL CENTER AT ORANGE, PLAINTIFF-RESPONDENT,
v.
SAVANNAH COOK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 5, 1981.
Decided February 9, 1981.
*291 Before Judges ALLCORN, KOLE and PRESSLER.
Barry S. Goodman argued the cause for appellant (Essex-Newark Legal Services, attorneys).
Gerald A. Liloia argued the cause for respondent (Riker, Danzig, Scherer, Debevoise & Hyland, attorneys; Dickinson R. Debevoise of counsel; Victoria A. Mondelli on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
This appeal raises the question of whether or not a medically indigent patient who is sued by a hospital for recovery of its unpaid bill for services may plead as a defense to the action the hospital's noncompliance with its obligations under the Hill-Burton Act[1] to provide a reasonable volume of free or reduced-cost *292 care for persons unable to pay for such services. In the only reported decision in this jurisdiction dealing with the issue the Law Division answered this question negatively. Cooper Medical Center v. Joyner, 165 N.J. Super. 482 (Law. Div. 1979). We disagree with that conclusion and hold to the contrary that persons who may be eligible for free or reduced-cost services under the Hill-Burton Act and its implementing federal and state regulations have a private right of action deriving therefrom to enforce the hospital's obligations either affirmatively or defensively. Accordingly, we reverse the order entered by the county district court denying defendant leave to amend her answer in order to plead noncompliance with the Hill-Burton Act as an affirmative defense and entering summary judgment in favor of plaintiff in the amount of its unpaid bill.
The factual context in which the issue before us arises is set forth in the affidavits herein filed and is largely undisputed. Plaintiff Hospital Center at Orange (Hospital) is a recipient of Hill-Burton Act construction funds pursuant to applicable federal and state legislation, regulation and contract. In March 1977 defendant Savannah Cook brought her minor son to the Hospital's emergency room. He was diagnosed as having sustained a fracture, was immediately admitted and discharged a week later. Defendant thereafter received a bill for services in the amount of $2,060.50, which she was unable to pay. She apparently had no recourse to any source of third-party payments and her sole income for the year preceding the hospitalization was by way of Social Security survivor's benefits for herself and her two children in the total monthly amount of $465. These benefits expired in April 1977, the month following the hospitalization, and defendant then obtained a factory job paying her a gross weekly income of $104. She apparently explained these financial circumstances to Hospital personnel after the bill was *293 rendered. The Hospital thereafter entered into an arrangement with her pursuant to its own voluntary program by which it agreed to reduce the bill to $862.10 if she paid it within six months. She was, however, able to pay only $350 during that time period and, accordingly, the Hospital brought suit against her in the county district court seeking $1,710.50, the full amount of the originally rendered bill less the payments actually made.
Defendant's initial response to the book-account complaint was a general denial. Thereafter, she sought leave to file an amended answer, alleging by way of affirmative defense that she was an intended beneficiary of the Hill-Burton Act and of the contracts entered into pursuant thereto between the Hospital and the governmental agencies, and that the Hospital had failed to perform its contractual obligations as to her by having failed to give her appropriate notice of the availability to her of free or reduced-cost hospital service and by failing to extend to her those free or reduced-cost services. The facts set forth by the affidavits regarding notice by the Hospital to defendant of potentially available Hill-Burton financial assistance make clear that absolutely no mention thereof was made in the original admitting forms although those forms bear the notation that defendant had no medical insurance and would, therefore, be herself responsible for the bill. It is also undisputed that no Hill-Burton reference was made on the bill ultimately rendered.[2] While the affidavits do raise a factual question as to whether or not a Hill-Burton notice was conspicuously posted on the premises, the Hospital makes no claim that any other form of notice thereof was given to defendant either orally or in writing. There is also a factual dispute as to whether or not defendant, *294 when she told the admitting personnel that she had no insurance, also stated that she had no money with which to pay the bill.
For the reasons hereafter set forth, these facts leave no doubt of the Hospital's failure to have complied with its Hill-Burton notice obligations, and thus the amended answer stated at least a prima facie defense to the action, provided such a defense is cognizable therein. The trial judge denied the motion to amend, having concluded, in reliance on Cooper Medical Center, supra, that the Hospital's failure to comply with its Hill-Burton obligations, even in respect of an intended beneficiary, did not as a matter of law constitute a defense to a bill collection suit but would only sustain recourse by defendant to administrative remedies. We disagree.
In concluding that the Hill-Burton Act does accord a private right of action and hence that the affirmative defense here sought to be raised was a viable one which should have been permitted, we rely not only on the legislation and its implementing regulations but on the weight of federal case law as well.
Explication of our reasoning requires some historical and legislative perspective. The underlying purpose of the Hill-Burton Act is to make federal funds available, through state disbursement, for the construction and modernization of hospitals and other medical facilities in order to assist the states in furnishing "adequate hospital, clinic, or similar services to all their people." 42 U.S.C.A. § 291. Prerequisite to federal funding is the adoption by the recipient state of an approved and conforming state plan to assure compliance with the purpose and policy of the act. 42 U.S.C.A. § 291c(e). Part of the state obligation in its disbursing of funds is to obtain assurances from the applicant that it will make "available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor." 42 U.S.C.A. § 291c(e)(2). Thus, the provision of a reasonable amount of uncompensated services to those medically indigent *295 is, in effect, the Hospital's quid pro quo for its receipt of capital funds under the act. The manner in which the hospital is required to meet its "reasonable volume" obligation is, moreover, delineated in detail both by federal regulation, 42 C.F.R. § 53.111, and by implementing and conforming state plan.
42 C.F.R. § 53.111, encaptioned "Services for Persons Unable to Pay," was initially promulgated in 1973. Among its provisions was the adoption of presumptive guidelines for determining the amount of "uncompensated services" which would constitute compliance with the hospital's "reasonable volume"[3] obligation. It is not disputed that the guideline chosen by plaintiff Hospital here is that prescribed by § 53.111(d)(1), namely, the annual provision during the period of its obligation of uncompensated services in an amount equal to 10% of all federal assistance provided under the act. Nor is it disputed that pursuant to this formula plaintiff Hospital's obligation for the year 1977 was approximately $56,000.
With respect to the manner in which hospitals are to allocate uncompensated services to qualified potential recipients thereof, the 1973 version of 42 C.F.R. § 53.111 made no specific provision for the giving of any notice to patients of the availability or potential availability for free or reduced-cost services under the act. The regulation did provide, however, that in computing the annual amount of uncompensated services it had rendered, the hospital could include "only those services provided to an individual *296 with respect to whom the applicant has made a written determination prior to any collection effort other than the rendition of bills that such individual is unable to pay...." 42 C.F.R. § 53.111(f)(1). This provision which permitted the hospital to defer its determination of eligibility for financial assistance until after the rendering of the bill, was invalidated by the federal district court in Corum v. Beth Israel Medical Center, 373 F. Supp. 550 (S.D.N.Y. 1974), on the grounds of its inconsistency with the purpose and policy of the Hill-Burton Act. It was the perception of Corum that the delayed determination permitted by the regulation would constitute a device whereby the obligated hospitals could effectively avoid their Hill-Burton responsibilities and thus subvert the intent of the act by the simple expedient of writing off bad debts in claimed satisfaction of the obligation to have provided uncompensated services. Thus, the court in Corum explained that
If a hospital is not obliged to make a determination of indigency prior to the rendition of services, many truly indigent persons may incur liabilities to it in the hope of qualifying for free or below cost services, which they will later be hard pressed to pay if the hospital declines to treat them as beneficiaries of its Hill-Burton assurance on the ground that by the time of billing its requirement has been satisfied [for the current fiscal year]. Furthermore, ... many such persons will be discouraged by the uncertainty of their status from seeking any medical assistance at all.
It is fully understandable that hospitals wish to count towards their Hill-Burton requirement all services for which collection proves difficult. The statute, however, does not contemplate this convenient result. Rather, the only services for which the statutory assurance is received are those provided to persons who are "unable", not merely unwilling to pay. Bad debts incurred by the hospitals from persons not covered by the statute are an expense of operating which they must bear themselves.
Accordingly, a determination of genuine inability to pay, in terms of financial resources and income and not merely of refusal to pay the bill, must precede a decision to use the services rendered or to be rendered in satisfaction of the Hill-Burton requirement. In view of the strong interest of plaintiffs in a preadmission determination of inability to pay, and in the absence of any valid reason for postponement of the decision, we hold that it must be made before rendition of services and that the present provision is invalid. [at 557-558]
As a result of the Corum decision the then Department of Health, Education and Welfare (now the Department of Health and Human Services) forthwith adopted new interim guidelines *297 in accordance therewith and notified all Hill-Burton agencies thereof. See Newsom v. Vanderbilt University, 453 F. Supp. 401, 414 (M.D.Tenn. 1978). These guidelines were formally incorporated in 42 C.F.R. § 53.111 in 1976 by amendment of both section (f) and section (i). Section (f), as amended, requires a written determination of eligibility to be made by the hospital prior to rendering services except where emergency services are rendered. In the case of such emergency services, the bill rendered therefor is required to contain the eligibility information prescribed by the notice provisions of section (i). Those notice provisions, also added by the 1976 amendment and obviously critical to ensuring the hospital's bona fide performance of its obligations, require the posting of notice in the hospital of a prescribed form advising patients of their potential Hill-Burton right. Section (i) further requires that if a hospital has, like plaintiff, opted for the 10% guideline and has provided uncompensated services in that amount prior to the end of its fiscal year, it must either
(1) add to such notice language stating that the facility's obligation is limited to a specified dollar volume of uncompensated services and that if the facility has, during a specified period (e.g., year, quarter, month), already provided a volume of uncompensated services sufficient to satisfy such obligation, any person inquiring about such services will be given a written statement to that effect which shall also state when additional uncompensated services will be available; or (2) post an additional notice stating that the facility's obligation has been satisfied for the current period and stating when additional uncompensated services will be available.
All of these requirements were added in 1976 to the New Jersey State Plan, Section J. See 8 N.J.R. 182(b) (1976). The 1976 revision of the State Plan further imposed the express responsibility upon the hospital "to affirmatively seek out, refer the patient to, and provide the patient with information on all available sources of reimbursement for medical services to persons unable to pay." State Plan, Section J, paragraph 1(g).
From the foregoing it is clear that plaintiff Hospital failed to comply with 42 C.F.R. § 53.111. First, it failed by its own admission to provide defendant with Hill-Burton information when it billed her for the services rendered on an emergency *298 basis. Second, although it has suggested to us that by March 1977 its Hill-Burton commitment for that year was almost certainly already met, it makes no assertion that it provided in its posted notices the additional information required in that circumstance.[4]
Because the failure of the Hospital to have included the requisite information with defendant's bill so indisputably constitutes a violation of the federal and state notice provisions, we need not decide the question as to whether merely posting the notice in compliance with 42 C.F.R. § 53.111(i) also satisfies the further State Plan requirement, above referred to, that the hospital take affirmative steps to assure recourse by patients to all available forms of financial assistance. We seriously doubt, however, that the posting of notice alone can reasonably be regarded as fulfilling that responsibility. We are in full agreement with the observations made in Newsom v. Vanderbilt University, supra, 453 F. Supp. at 428, regarding "the fallacy of expecting posted notices to be effective." As the court there said
The conditions under which anyone, indigent or not, enters a hospital are seldom if ever conducive to calm, level-headed reflection. Those unable to pay for the services they are seeking are even more likely than others to be distressed. Yet the posted notice provision presumes that in this situation the patient (or equally distressed relative seeking to admit a patient) will perform four steps necessary to render the posted notice actually meaningful: First, he must see the notice. Second, he must be able and have sufficient curiosity to read the notice. Third, he must understand the notice. And fourth, he must act on the notice by inquiring at the designated office. If this office is closed he must take still a fifth step of further inquiry. Each of these steps can be seen by anyone with a realistic view of human nature as a potential stumbling block between a patient and any real chance just to apply for Hill-Burton care. Ibid.

We further note that while the Hospital's affidavit here recites that in 1977 it followed a general practice of interviewing patients to determine indigency and "possible participation in the Hill-Burton program," it does not undertake to refute defendant's *299 assertions that at least in her case no such interview was conducted. Indeed, it hardly seems likely that such an interview was conducted in view of the further statement in the Hospital's affidavit that the Hospital's records in "Mrs. Cook's specific case ... show that there were no notations made by the admitting office at the time her son was admitted in March 7, 1977 that she was indigent." Obviously, even a cursory interview conducted for Hill-Burton purposes would have revealed that she was living on Social Security benefits alone.
Having concluded that there is no question of fact as to the Hospital's failure in its dealing with defendant to have complied with its Hill-Burton notice obligation in at least one critical respect, we address the remaining question as to whether the failure was available to defendant as an affirmative defense to this action. We answer that question affirmatively.
First, we are satisfied that either a medically indigent individual or a class of such individuals or the representative of such a class has the right to pursue a civil remedy against a hospital in order to compel its compliance with its Hill-Burton obligations. This was the holding of Euresti v. Stenner, 458 F.2d 1115 (10 Cir.1972), which based that right upon two separate and independent considerations. It was first that court's view that since the legislative history as well as the express provisions of the Hill-Burton Act make clear that its primary intent was to provide medical indigents with necessary hospital services, the failure of the act to specifically afford such persons a private right of action could not be regarded as indicative of a legislative intent to withhold such a right. Rather, the court concluded, it is consonant with and serves the legislative intent to imply from the act the availability of a civil remedy for those within its protective realm. The court further concluded that the intended beneficiaries of the act are also the third-party beneficiaries of the contractual arrangements between the hospital and the state agency disbursing the federal funds, a thesis based on the fact that the assurances given by *300 the hospital to the state agency in respect of its undertaking to furnish uncompensated services is the essential prerequisite for federal funding and hence the sine qua non of the state-hospital contract. That reasoning has been generally adopted by the federal courts. See Saine v. Hospital Auth. of Hall Cty., 502 F.2d 1033 (5 Cir.1974); Newsom v. Vanderbilt University, supra; Corum v. Beth Israel Medical Center, 359 F. Supp. 909 (S.D.N.Y. 1973). We are persuaded by Euresti's reasoning, recognizing this jurisdiction's acceptance of the principle that the public policy and public interest intended to be promoted by remedial social legislation are ordinarily advanced by implying therefrom a judicially cognizable cause of action which enforces the legislative purpose. See Lally v. Copygraphics, 173 N.J. Super. 162 (App.Div. 1980). Accordingly, we reject the contrary views of the two state courts upon which the Law Division in Cooper Medical Center v. Joyner, supra, relied in reaching a contrary result. See Yale-New Haven Hosp. v. Matthews, 32 Conn.Sup. 539, 343 A.2d 661 (App.Div. 1974), cert. den. 423 U.S. 1024, 96 S.Ct. 467, 46 L.Ed.2d 398 (1975); Valley Credit Service, Inc. v. Mair, 35 Or. App. 637, 582 P.2d 47 (App.Ct. 1978). In the context, moreover, of securing rights vouchsafed by statute, we perceive no distinction between an affirmative right of action and a defensive right. The remedy indeed may be the same. See, e.g., Newsom v. Vanderbilt University, supra, 453 F. Supp. at 430, an affirmative action brought to insure prospective compliance in which, among the district court's remedial orders, was the provision enjoining the hospital-defendant "from bringing, or having brought on its behalf, any action to collect amounts owed by any patient for services that would have qualified as Hill-Burton care but for the improper acts of defendant hospital."
We are aware that following the decision in Euresti the Hill-Burton Act was amended to expressly provide a conditional right of civil action to compel compliance with the hospital's uncompensated services assurances. See 42 U.S.C.A. § 300p-2, adopted in 1975 by Pub.L. 93-641, § 4, repealed by Pub.L. 96-79, *301 Title II, § 201(a), and replaced by 42 U.S.C.A. § 300s-6, adopted in October 1979. 42 U.S.C.A. § 300s-6 permits an action to effectuate compliance with those assurances by any individual other than the Secretary of the Department of Health and Human Services, but only if such person has first filed a complaint with the Secretary and within six months thereafter the Secretary has dismissed the complaint or the Attorney General has not brought a civil action. Administrative recourse to the State Department of Health is also available under the State Plan.
The question then is whether any doctrine of primary jurisdiction or exhaustion of administrative relief would bar the raising of the defense of noncompliance in a state civil action prior to administrative consideration of a noncompliance complaint.[5] We first do not regard 42 U.S.C.A. § 300s-6 as constituting such a bar since it requires first resort to administrative action only as a precondition to instituting a suit to enforce compliance. It does not purport to address the defensive rights of a medical indigent sued by a hospital which has failed, to that indigent's immediate and direct detriment, to comply with its contractual assurances.
We similarly conclude with respect to the exhaustion doctrine, vis-a-vis the state agency. In this regard we note first that the exhaustion doctrine is not jurisdictional, hence not mandatory, and hence subject to relaxation. See R. 2:2-3(a)(3) and R. 4:69-5, both authorizing relaxation of the exhaustion requirement in the interests of justice. In our view, the test of interests of justice is met in the circumstances here. First, there is no assurance that the administrative remedy would vindicate defendant's claim to entitlement to free or reduced-cost services. The administrative process, even where a complaint *302 is sustained, appears rather to be designed to assure the hospital's prospective compliance. Cf. Saine v. Hospital Auth. of Hall Cty., supra, 502 F.2d at 1037. Thus, the administrative remedy may provide no meaningful remedy to defendant at all. See Lally v. Copygraphics, supra, 173 N.J. Super. at 179, in which we held that where an administrative remedy available to an individual in vindication of rights afforded by remedial social legislation are inadequate, "the judicial remedy must be deemed to coexist."
More significantly, however, depriving defendant of the opportunity to plead noncompliance defensively on the ground of failure of exhaustion of administrative relief would subject her to entry of judgment in the bill collection case before the meritorious question of the hospital's compliance could have been administratively determined. Such a result would, of course, be contrary to any notion of fundamental fairness, economy of judicial administration or the entire controversy doctrine. See, e.g., Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277, 293 (App.Div. 1977), certif. den. 75 N.J. 528 (1977). It may well be that if the factual questions raised by the noncompliance defense are complex and require application of administrative expertise, the court in which the bill collection suit is pending may opt temporarily to stay its hand and transfer the defensive case to the appropriate agency for initial review.[6] See R. 1:13-4(a) authorizing such transfer. Where as here, however, the legal question raised by the defense is clear and does not involve administrative expertise, it should be forthwith disposed of by the trial court. See, e.g., Farmingdale Realty Co. v. Farmingdale, 55 N.J. 103 (1969).
*303 The final question, then, is the effect of the Hospital's noncompliance here on its right to collect its bill. We conclude that the nature of the noncompliance here precludes it from so doing. For the reasons we have heretofore indicated, the most effective and expeditious way to ensure hospital compliance with its Hill-Burton responsibilities is to ensure that persons eligible for that assistance request it. They obviously cannot request it unless they know about its availability. And they will not know about its availability unless the hospital tells them about it. We, therefore, regard the notice requirements imposed upon hospitals by state and federal imperatives to be the fundamental technique for assuring fulfillment both of the federal legislative purpose and of the hospitals' compliance with assurances which they have given the state as a condition of capital funding. Because failure of a hospital to comply with its notice obligations so clearly constitutes a mechanism by which the legislative intent may be defeated, the dictates of public policy demand that they be subject to the strictest possible enforcement. Our courts have heretofore steadfastly refused to enforce private contractual rights if enforcement would do violence to overriding concerns of public policy; consequently, violation of public policy is a traditionally cognizable and viable affirmative defense to a contract action. See, e.g., International Tracers of America v. Rinier, 139 N.J. Super. 573 (App.Div. 1976); Hy-Grade Oil Co. v. N.J. Bank, 138 N.J. Super. 112 (App.Div. 1975), certif. den. 70 N.J. 518 (1976); Newton v. Demas, 107 N.J. Super. 346 (App.Div. 1969), certif. den. 55 N.J. 313 (1970); Kulp Real Estate v. Favoretto, 127 N.J. Super. 74 (Cty.Ct. 1974); Grossman Furniture Co. v. Pierre, 119 N.J. Super. 411 (Cty.Dist.Ct. 1972). So here. Accordingly, we hold that the failure of a Hill-Burton obligated hospital to have given required notice to a medical indigent or one who is presumptively a medical indigent, as defendant here clearly is, constitutes an absolute bar to the right of the hospital to sue for its bill for services rendered to such person.
*304 The judgment appealed from in favor of plaintiff is reversed. The order denying defendant's motion to amend her answer is reversed, and we remand for entry of judgment dismissing the complaint.
NOTES
[1] The Hill-Burton Act, first enacted as Title VI of the Public Health Service Act of 1944, 42 U.S.C.A. § 291 et seq., was extensively amended in 1964 by legislation entitled The Hospital Survey and Construction Act of 1964. The provisions of the original Hill-Burton Act as amended from time to time thereafter were substantially reenacted as Title XVI of the National Health Planning and Resources Development Act of 1974, 42 U.S.C.A. §§ 300o-300t, and again extensively amended in 1979. See, generally, Newsom v. Vanderbilt University, 453 F. Supp. 401, 404 (M.D.Tenn. 1978). This entire complex of legislation is herein referred to generally as the Hill-Burton Act, specific references to specific provisions thereof being made as necessary.
[2] The 1979 affidavit of the Hospital's business office manager is clear as to this in its statement that in contradistinction to its practice during the time when defendant's son was a patient, "the Hospital now includes in every bill to a patient admitted as an emergency, a letter indicating the possibility of getting a reduction of the cost of services under the Hill-Burton Act.
[3] "Uncompensated services" is defined by 42 C.F.R. § 53.111(b)(6) as "services which are made available to persons unable to pay therefor without charge or at a charge which is less than the reasonable cost of such services. The level of such services is measured by the difference between the amount charged such persons for such services and the reasonable cost thereof."

"Reasonable volume of services to persons unable to pay therefor" is defined by 42 C.F.R. § 53.111(b)(7) as "a level of uncompensated services which meets a need for such services in the area served by an applicant and which is within the financial ability of such applicant to provide."
The determination of criteria identifying persons unable to pay for services is left subject to broad guidelines developed by the individual states. 42 C.F.R. § 53.111(g).
[4] Although the Hospital claims to have posted the basic notices, defendant asserts that she did not see them.
[5] We note that defendant here did file administrative complaints with federal and state authorities in February 1979, a month before the letter opinion of the trial court. We were advised at oral argument that no response to either complaint had been received as of the argument date.
[6] An analogous procedural device is customarily employed in cases involving the Public Employment Relations Commission. See, e.g., Asbury Park Bd. of Ed. v. Asbury Park Ed. Ass'n, 155 N.J. Super. 76 (App.Div. 1977). We do not, however, as in the PERC cases, view the agency jurisdiction here as primary, for the reasons set forth in Newsom v. Vanderbilt University, supra. Cf. Lally v. Copygraphics, supra, 173 N.J. Super. at 179 (App.Div. 1980).