## ANGELA C. DARK v. PRINCE GEORGE'S COUNTY, MARYLAND

[No. 1535, September Term, 1980.]

*Decided June 8, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and WILNER, JJ.

*Stephanie Edelstein* and *Timothy J. Paulus* for appellant.

*John T. Beamer, II,* and *Michael P. DeGeorge, Associate County Attorneys for Prince George's County,* with whom were *Robert B. Ostrom, County Attorney,* and *Michael O. Connaughton, Deputy County Attorney,* on the brief, for appellee.

WILNER, J. delivered the opinion of the Court.

On November 20, 1978, appellant was admitted to the psychiatric ward of Prince George's General Hospital (appellee) as a voluntary emergency admission. The precise nature of her illness is not reflected in the record; but, aside from the fact that she was an emergency psychiatric admission, there is nothing to suggest that she was legally incompetent. Nor does she claim to have been incompetent, illiterate, or blind. Appellant remained in the hospital until her discharge on December 15, 1978. Five days later, on December 20, the hospital sent her an itemized bill in the amount of $3,792.63 for the services that it had rendered.

Appellant never complained about the quality of the care that she received, or that the charges were unreasonable; indeed, she made no protest at all about the bill. But neither did she pay it or any part of it, or offer to pay it or any part of it.

Eventually, on May 29, 1980, the hospital filed suit against appellant in the Circuit Court for Prince George's County to collect the overdue debt. Accompanying the Declaration was a motion for summary judgment supported by an affidavit of the manager of delinquent accounts. Attached as a single exhibit to the affidavit, and attested as being true and correct, were: (1) a copy of the itemized bill sent to appellant on December 20, and (2) an "admitting record" purportedly signed by appellant upon her admission.

The "admitting record" stated that appellant was employed as a typist for Rapp, Inc. in Washington, D. C., that she had been so employed for two years, and that she earned $200 biweekly. The form further indicated that appellant was then twenty years old, that she lived with her mother, who was employed as a "clerk supervisor" for the

Library of Congress, and that the family received no income from social services.[1] Just above appellant's signature was a statement certifying the truth of the information on the form and guaranteeing payment of all charges incurred. Appellant has never denied signing or understanding that form.

Appellant's multiple response to the hospital's action came on July 22, 1980. The thrust of her defense was that (contrary to the statements on the admission form, which she omitted to mention) she was indigent at the time of her admission and that, by reason of the Federal Hospital Survey and Construction Act of 1946 (hereafter the "Hill-Burton Act"), she was entitled to free or below-cost care. In furtherance of that defense, appellant:

(1) Wrote to the hospital by letter dated July 23, 1980, requesting "uncompensated services" pursuant to CFR 124.502 (one of the many Federal regulations adopted in 1979 to implement the Hill-Burton Act);[2]

(2) Purportedly filed a complaint on July 21, 1980, with the Federal Department of Health and Human Services (HHS) claiming that the hospital violated the "uncompensated service requirements" of the Act and its implementing regulations and asking that the Department "find her eligible for free or below-cost care, and . . . order the hospital to provide below-cost care to her." This letter, addressed to a Dr. H. McDonald Rimple, Assistant Surgeon General, Regional Health Administrator, Department of Health and Human Services, Region III, Philadelphia, was never received by Dr. Rimple (or apparently anyone else at HHS).

(3) Answered the Declaration and the motion for

---

**1.** One part of the form asked whether the patient was a "welfare recipient." The "yes" box was checked with a double "x," but the "x" marks were then scratched through. In the part asking "gross family income" was written "NONE FROM SOC SERVS JOB — $200 BI WK."

**2.** The letter stated that "[a]t the time of her hospitalization, Miss Dark was unemployed and had no income. Miss Dark is willing to provide verification of her financial condition at your request. Miss Dark's medical insurance with GHI, as a dependent of her father, paid nothing of the total bill, as her benefits and coverage had run out. Her mother applied for and was found ineligible for Medical Assistance."

summary judgment and moved for a stay of the judicial proceeding pending the administrative determination by the Department of Health and Human Services.

Appellant's argument, as laid out in her initial pleadings, was that (1) the hospital had received Federal construction loans or grants under the Hill-Burton Act; (2) it was therefore required by that Act to provide free or below-cost care to low income patients and to establish procedures for identifying individuals eligible for such care; (3) the hospital had established such procedures (a copy of which was appended as an exhibit to the motion for stay) but had failed to follow them in processing appellant's account; and (4) appellant believed herself to be eligible for such care. In effect, appellant was seeking to interpose an alleged violation of the hospital's obligation under the Hill-Burton Act to provide free or below-cost care to indigent patients as a defense to its collection action against her.

The hospital's motion for summary judgment and appellant's motion for stay were heard on October 2, 1980. The court denied the motion for stay on the ground that it had no authority to grant it, and it granted the motion for summary judgment on the theory that if the Federal agency found the hospital to be in violation of the Hill-Burton Act, it would take some action to annul the judgment.

The ultimate questions raised by appellant are not easy ones to answer. Reasonable arguments can be made both to support and to deny the right of an allegedly indigent patient to translate a hospital's obligations under the Hill-Burton Act into an individual right of free or below-cost care, and then to raise that right in defense to a collection action. It is a matter of first impression in Maryland; we have no precedential authority. Of the few State courts that have so far considered the question, all but one have rejected the position espoused by appellant. *See Yale-New Haven Hospital v. Matthews,* 343 A.2d 661 (Conn. App. Div. 1974), *cert. denied,* 423 U.S. 1024 (1975); *Falmouth Hospital v. Lopes,* 382 N.E.2d 1042 (Mass. Sup. 1978); *Valley Credit Service, Inc. v. Mair,* 582 P.2d 47 (Ore. App. 1978); *John T. Mather Memorial Hospital, Inc. v. Marco,* 413 N.Y.S.2d 88

(Dist. Ct. 1979); but *compare Hospital Center at Orange v. Cook,* 426 A.2d 526 (N.J. Super. 1981) permitting such a defense to be raised.

We need not answer those ultimate questions in this case. For the reasons shortly to be explained, we conclude that even if the Federal Act and the regulations promulgated under it permit such a defense, as determined by the New Jersey court, *supra,* this appellant has no right to raise it in this case.

Even to address that limited issue, however, it is necessary for us to consider some of the complex history of Hill-Burton and the regulations adopted under it. For a more detailed chronology, *see* Note, *The Hill-Burton Act, 1946-1980: Asynchrony In The Delivery Of Health Care To The Poor,* 39 Md. L. Rev. 316 (1979); *also* Rose, *Federal Regulation Of Services To The Poor Under The Hill-Burton Act: Realities And Pitfalls,* 70 Northwestern U.L. Rev. 168 (1975).

Hill-Burton was first enacted in 1946 as P.L. 79-725.[3] Its declared purpose (§ 601) was to assist the States in constructing public and other nonprofit hospitals in order to "afford the necessary physical facilities for furnishing adequate hospital, clinic, and similar services *to all their people. . . .*" (Emphasis supplied.) It proposed to achieve that end by allocating substantial Federal funds to the States, pursuant to State plans approved by the Surgeon General, to be used as grants in aid of approved hospital construction projects.

Congress sought to assure that the Federal largesse would be of service to all the people in three principal ways: (1) by requiring, through regulations to be promulgated by the Surgeon General, that the State plans contain certain assurances in that regard; (2) by requiring the individual project applications to assure compliance with those State plan provisions; and (3) by authorizing the Surgeon General to terminate further grants to a State upon a finding of sub-

---

**3.** The Act added a new Title VI to the Public Health Service Act, adding to title 42 U.S.C. new sections 291, 291a-291c, 291d-291h and 291i-291m.

stantial noncompliance with the obligations in the State plan. The key provision dealing with the State plan was § 622 (f). It directed:

"That the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color, *and shall provide for adequate hospital facilities for persons unable to pay therefor.* Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group; *and (2) there will be made available in each such hospital or addition to a hospital a reasonable volume of hospital services to persons unable to pay therefor,* but an exception shall be made if such a requirement is not feasible from a financial standpoint." (Emphasis supplied.)

As is evident from the aforequoted statutory language, the obligation was a dual one — avoiding both racial-religious and economic discrimination; and, although there is undoubtedly an overlap in the affected populations, the obligations are distinct. The former, with which we are not concerned here, has been termed the "community service" obligation; the latter, which *is* at issue, is known as the "uncompensated care" requirement.[4]

---

4. These are the terms used in the various regulations issued under the Act. *See, for example,* 42 CFR §§ 53.111 — 53.113 (1973), adopted 37 Fed. Reg. 182 (1/6/72); current 42 CFR §§ 124.501 — 124.607 (1979).

Neither the statute nor the initial regulations adopted by the Surgeon General defined with particularity what was meant by the phrase in § 622 (f) (2) — "a reasonable volume of hospital services to persons unable to pay therefor." The term "reasonable volume of hospital services" was not defined at all; the 1947 regulations defined "persons unable to pay therefor" as "both the legally indigent and persons who are otherwise selfsupporting but are unable to pay the full cost of needed services." [5] Equally lax was any effective enforcement of the obligation — whatever it was — either by the Federal Government [6] or by the States, who, under their plans, had the primary responsibility for enforcement.

Frustrated at the Executive level, advocates for the poor eventually began to seek redress through class action suits in the courts; and in at least three cases, they were successful in establishing an *implied* right of private action to enforce a hospital's obligation to provide "uncompensated care." *See Cook v. Ochsner Foundation Hospital,* 319 F. Supp. 603 (E.D. La. 1970); *Organized Migrants in Community Action, Inc. v. James Archer Smith Hospital,* 325 F. Supp. 268 (S.D. Fla. 1971); *Euresti v. Stenner,* 458 F.2d 1115 (10th Cir. 1972), *rev'g* 327 F. Supp. 111 (D. Col. 1971).[7] As a result of these decisions, HEW quickly began to develop more particular standards concerning hospital compliance with the "uncompensated care" obligation. These new standards became effective as interim binding regulations in July, 1972,[8] and, with minor changes, were continued as final regulations in June, 1973.[9]

The new regulations, which remained in effect until 1979, and thus were operative during appellant's stay at Prince

---

**5.** 12 Fed. Reg. 6176.

**6.** In 1966, by P.L. 89-749, regulatory authority was transferred from the Surgeon General to the Secretary of Health, Education and Welfare (HEW), and now is vested in the Secretary of Health and Human Services (HHS).

**7.** At the time, there was no *express* provision in the statute for private enforcement. The actions, which sought to compel the respondent hospitals to provide a "reasonable volume" of free or below-cost care to the class represented by the indigent plaintiffs, were based on a standing implied from their alleged status as one of the chief beneficiaries of the Act.

**8.** 37 Fed. Reg. 14,719 (7/22/72).

**9.** 38 Fed. Reg. 16,353 (6/22/73).

George's General Hospital, made a number of significant changes, in terms of both defining and enforcing the "uncompensated care" obligation. Of particular significance were:

(1) 42 CFR § 53.111 (b) (7), which defined the term "reasonable volume of services to persons unable to pay therefor" as "a level of uncompensated services which meets a need for such services in the area served by an applicant and which is within the financial ability of such applicant to provide." [10]

(2) 42 CFR § 53.111 (d), which provided a "presumptive compliance guideline." A hospital was deemed to be in presumptive compliance with its "uncompensated care" obligation if, in a fiscal year, it *either* (a) budgeted and, on request, made available uncompensated services at a level not less than the lesser of 3% of operating costs or 10% of the Federal assistance it received under the Act, *or* (b) certified that it would "not exclude any person from admission on the ground that such person is unable to pay for needed services and that it will make available to each person so admitted services provided by the facility without charge or at a charge below reasonable cost which does not exceed any such person's ability to pay therefor. . . ."

This guideline left the hospital with the choice of setting aside each year a certain amount of money for "charity" care (and actually providing that much care) or adopting what has since become known as an "open door" policy — turning no one away because of inability to pay.

(3) 42 CFR § 53.111 (g), which required the State plan to establish "criteria for identifying persons unable to pay for services, which shall include persons who are otherwise self-supporting but unable to pay the full charge for needed services."

(4) 42 CFR § 53.111 (i), which required the hospital to post a notice "within the facility (admissions, office, emer-

---

10. Subsection (b) (6) defined the term "uncompensated services" as "services which are made available to persons unable to pay therefor without charge or at a charge which is less than the reasonable cost of such services. The level of such services is measured by the difference between the amount charged such persons for such services and the reasonable cost thereof."

gency department and business office) for the purpose of informing patients or potential patients that criteria for eligibility and applications are available *upon request.*" (Emphasis supplied.) The required notice was to contain substantially the following language (in relevant part):

## "NOTICE OF HILL-BURTON OBLIGATION

"This hospital (or other facility) is required by law to give a a [sic] reasonable amount of service at no cost or less than full cost to people who cannot pay. If you think that you are eligible for these services, please contact our business office (give office location) and ask for assistance. If you are not satisfied with the results, you may contact (the State Hill-Burton agency with address)."

(5) 42 CFR § 53.111 (j), which required the State plan to provide for evaluation and enforcement of the "uncompensated care" obligation. The State enforcement agency was required to audit compliance at least annually and to establish procedures for investigating complaints. In addition, the State plan had to provide "adequate methods of enforcement of the assurance, including effective sanctions to be applied against any facility which fails to comply with such assurance. Such sanctions may include, but need not be limited to, license revocation, termination of State assistance, and court action."

The thrust of these new regulations was to place upon the State the direct and primal responsibility for enforcing the "uncompensated care" obligation.

Pursuant to these regulations, Maryland adopted a new State plan. The 1974 version of it, which has not been revised, required each hospital subject to the Act to notify the Department of Health and Mental Hygiene (DHMH — the State enforcement agency) of whether it opted for the 3%/10% or the "open door" method of compliance.[11] It also required that: [12]

---

11. *See* State of Maryland Medical Facilities Survey And Plan (1974), p. 34.

12. *Id.,* p. 35.

"Persons who are unable to pay must be identified by institutional procedures for the evaluation of income and resources in relation to the reasonable costs of needed services. Each case shall be examined individually, considering such factors as health and medical care insurance coverage, personal or family income, the size of the patient's family, and the financial obligations and resources of the patient or family.

The latest revision of the Office of Economic Opportunity (OEO) Poverty Guidelines may be used as a standard of need for low income families."

The next development came from Congress with the enactment of P.L. 93-641 in 1974. Known officially as the National Health Planning and Resources Act of 1974, the law, among other things, enacted a new title XVI to the Public Health Service Act (title 42 U.S.C. §§ 300q — 300t), and, though not repealing the original Hill-Burton Act (title VI), allowed it more or less to die on the vine by terminating all funding under it and channeling future hospital construction funding through the new title XVI.

The new Act did two important things from the perspective of this case: (1) it transferred primal enforcement responsibility of the "uncompensated care" obligation from the States back to the Secretary of HEW; and (2) it provided an *express,* but conditional, right of private enforcement. The relevant section is § 300p-2 (c) (of title 42), which provides:

"The Secretary shall investigate and ascertain, on a periodic basis, with respect to each entity which is receiving financial assistance under this title or which has received financial assistance under title VI or this title, the extent of compliance by such entity with the assurances required to be made at the time such assistance was received. If the Secretary finds that such an entity has failed to comply with any such assurance, the Secretary shall take the action authorized by subsection

(b) [13] or take any other action authorized by law (including an action for specific performance brought by the Attorney General upon request of the Secretary) which will effect compliance by the entity with such assurances. *An appropriate action to effectuate compliance with any such assurance may be brought by a person other than the Secretary only if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary."* (Emphasis supplied.) [14]

This — the 1973 regulations, the 1974 State plan, and the provisions of § 1612 (c) — was the state of the law and the nature of appellee's obligation during the period of appellant's admission. We shall return to it shortly; but first it is necessary to jump ahead.

In May, 1979, HHS (by then the successor to HEW) adopted a new set of regulations which, among other things:

(1) Eliminated the "open door" compliance option, thus requiring an annual allotment of 3% of operating costs or 10% of Federal assistance received (as adjusted according to the national Consumer Price Index) (42 CFR § 124.503).

(2) Redefined the class of persons "unable to pay for health services." Under the new definition (42 CFR § 124.506), a person whose individual or family income for the twelve months preceding eligibility determination did not exceed the "current poverty income guideline of the Community Services Administration" had to be treated "without charge." If the person's income, so calculated,

---

**13.** Subsection (b) authorizes the Secretary to withhold funds from projects found to be in violation.

**14.** The impulse for shifting direct enforcement back to HEW apparently was a report by the General Accounting Office highly critical of both HEW and the State enforcement agencies in monitoring compliance with the "uncompensated care" requirement. *See* Senate Report No. 93-1285, Senate Labor and Public Welfare Committee, November 12, 1974.

exceeded the "current poverty income guideline," but not by more than double, he had to be treated either without charge or in accordance with a "schedule of charges" specified in an allocation plan.

(3) Completely rewrote the "notice" requirement (42 CFR § 124.505). In addition to bilingual "posted" notice, the new regulation required "individual written notice of the availability of uncompensated services to each person who seeks services in the facility on behalf of himself or another." This individual notice, among other things, had to state that the facility "will make a written determination of whether the person will receive uncompensated services, within two working days of a request for uncompensated services."

(4) Stated that a request for uncompensated services "may be made at any time, including following institution of a collection action against the individual."

(5) Established new and more particularized procedures for investigation of complaints by the Secretary. In that regard, § 124.511 (a) (2) (i) stated that "[a] complaint is considered to be filed with the Secretary on the date the [information required by the regulation] *is received* in the Office of the Regional Health Administrator for the Region of HHS in which the facility is located. . . ." (Emphasis supplied.) Section 124.511 (b) (1) authorized the Secretary, upon finding a violation, to "take any action authorized by law to secure compliance, including but not limited to voluntary agreement or a request to the Attorney General to bring an action against the facility for specific performance."

Finally, § 124.511 (a) (4) provides:

> "Section 1612 (c) of the Act provides that if the Secretary dismisses a complaint or the Attorney General has not brought an action for compliance within six months from the date on which the complaint is filed, the person filing it may bring a private action to effectuate compliance with the assurance. If the Secretary determines that he will be unable to issue a decision on a complaint or otherwise take appropriate action within the six

month period, he may, based on priorities for the disposition of complaints that are established to promote the most effective use of enforcement resources, or on the request of the applicant, dismiss the complaint without a finding as to compliance prior to the end of the six month period, but no earlier than 45 days after the complaint is filed."

We have alluded to these new regulations, adopted six months after appellant's discharge from the hospital, because in pressing her defensive claim she relies on those of them that would seem to benefit her.

At the time of appellant's admission, the appellee hospital had elected the "open door" method of compliance. Pursuant to that policy, appellant was, of course, admitted and treated. The question, then, is not whether she is entitled to *treatment* in view of her recently alleged indigency — she already received that — but only whether she should have to pay for it.

The thrust of appellant's complaint, as stated in her opposition to the motion for summary judgment, was that the hospital had failed to inform her "of the availability of charity care or determine her eligibility therefor." In support of that charge, her affidavit states only that "*I do not recall* any time during my admission, hospitalization or discharge, that the hospital informed me of the availability of free or below cost charity care at Prince George's General Hospital." (Emphasis supplied.)

Our difficulty with appellant's defense, as revealed in this record, is two-fold.

(1) Under the law in effect at the time of appellant's admission and stay, appellee was not required to give individual notice of potential eligibility for "uncompensated care." That, as noted, was first imposed by the 1979 regulations. Appellee's only obligations with respect to informing appellant of the charity care program were to post throughout its facility the notice specified by then 42 CFR

§ 53.111 (i) and to establish procedures for identifying eligible patients.[15]

Appellant did not aver a failure to post the required notice. She conceded that appellee had adopted procedures designed to identify eligible patients, and indeed attached a copy of appellee's written policy in that regard to her pleadings; and, although she alleged that the hospital failed to comply with those procedures, she did not indicate in what way it failed to comply. Appellee's policy on charity care, relied upon by appellant, states explicitly that "[i]t shall be the responsibility of the patient, or the responsible party, to request charity care" and that such request may be made at any time *"up to 90 days after service is rendered."* (Emphasis supplied.) [16]

In short, aside from her present claim of indigency (which appears to be at least partially inconsistent with the information given the hospital at the time of admission) and her bald allegation of noncompliance, appellant presented no facts to the court showing *how* the hospital failed to comply with the obligation it then had. It has long been the law, however, that "general allegations which do not show the facts in detail and with precision are insufficient to prevent the entry of a summary judgment." *Shaffer v. Lohr,* 264 Md. 397, 404 (1972); *Frush v. Brooks,* 204 Md. 315 (1954).

(2) Appellant's right to raise the Hill-Burton obligation in defense to a collection action — if it exists — emanates solely

---

**15.** Notwithstanding the absence of any such provision in the 1973 regulations, appellant contends that the hospital had some additional obligation to advise her personally of her possible eligibility for "uncompensated care." In support of that argument, she relies on an unsigned memorandum dated January 26, 1978, from one Kathy Warma, whose position is stated as "Attorney Advisor, Public Health Division," to a Dr. Harry P. Cain, Director, Bureau of Health Planning and Resources Development. We are not persuaded.

**16.** Appellant did not contend that this policy contravened the law in effect at the time of her admission; nor did she offer any excuse for failing to comply with it. She relied instead on the 1979 regulation permitting a request for "uncompensated care" to be made at any time, even after collection proceedings have commenced. That reliance, we think, is misplaced. Even if, *arguendo,* the new regulation applies retrospectively to permit appellant to make a present request that the charges be erased, it could not serve to make the hospital's refusal to grant that request a violation of the obligation it had at the time of appellant's admission.

from § 1612 (c) of the Federal Act. Assuming *arguendo* that such a defense constitutes "an appropriate action to effectuate compliance with [the hospital's] assurance," that section states without equivocation that such an action may be brought by appellant "*only* if a complaint has been filed by such person with the Secretary and the Secretary has dismissed such complaint or the Attorney General has not brought a civil action for compliance with such assurance within 6 months after the date on which the complaint was filed with the Secretary." (Emphasis supplied.)

The record here establishes utter noncompliance with that clear statutory condition. The July 21 letter to Dr. Rimple, as noted, was never received, and thus, under the regulation in effect at the time it was sent (42 CFR § 124.511 (a) (2) (i)), had no effect whatever.[17] Even if given effect, appellant would be precluded from prosecuting a private action until either the Secretary formally rejected the complaint or no action was taken on it for six months; and the record fails to indicate that either of those conditions was satisfied prior to the entry of summary judgment.

It is not necessary to "categorize" this deficiency as a lack of standing or a failure to exhaust available administrative remedies. The point is that appellant's statutory right to raise the defense (if it exists at all) is clearly a conditional one; and, absent compliance with that condition, it does not exist. *See Gordon v. Forsyth County Hospital Authority, Inc.,* 409 F. Supp. 708, 722 (M.D.N.C. 1976), *aff'd in part, vac. in part,* 544 F.2d 748 (4th Cir. 1976); [18] *John T. Mather Memorial Hospital, Inc. v. Marco, supra,* 413 N.Y.S.2d 88.

---

**17.** The record does not indicate what happened to the letter — only that it was not received by Dr. Rimple, or apparently by anyone else at HHS. We are advised by counsel (although for obvious reasons there is no reflection of it in the record) that in December, 1980 — two months *after* the entry of judgment — appellant refiled her complaint.

**18.** The District Court in *Gordon* concluded that

"individuals who seek compliance with an adopted Hill-Burton plan by a medical facility must pursue the course provided by Congress and first exhaust the administrative remedy provided by the statute. Any other resolution of this action, which would require the federal court to inquire into the unscreened, specific factual background of every individual plaintiff to determine if

For these reasons, we find no error in the granting of summary judgment.[19]

*Judgment affirmed; appellant to pay the costs.*

---

that person were eligible for Hill-Burton care and were denied such care improperly, would place an intolerable burden on the court system and one for which it is ill-prepared. Federal courts cannot police the day-to-day administrative decisions of Hill-Burton hospital officials, and Congress has, by enacting the above-mentioned statute, implicitly recognized that judicial manpower is insufficient to have a federal judge in every Hill-Burton hospital."

On appeal, the parties stipulated that during the pendency of the appeal the plaintiffs had in fact satisfied the statutory condition, and, without objection by the hospital, those claims initially barred by the District Court were remanded. We see no justification for a remand in this case. Appellant's first effective complaint to the Secretary pursuant to § 1612 (c) of the Act was not made until two months *after* the rendition of judgment. She has not diligently and fairly pursued her statutory remedy, even after obtaining the assistance of counsel; and we see no reason to reward that laxity by keeping open a claim that is already more than two years old.

19. Appellant makes no complaint in this appeal about the court's rejection of her motion for stay, and we therefore do not address that issue.